**Betty ROONEY, Appellant,**

v.

**NATIONAL SUPER MARKETS, INC., and Kim Roger Luther, Respondents.**

**No. 47525.**

Missouri Court of Appeals,
Eastern District,
Division Three.

April 3, 1984.

Wayne T. Schoeneberg, St. Charles, for appellant.

Richard H. Ulrich, St. Louis, for respondents.

CRANDALL, Judge.

Plaintiff Betty Rooney was employed as a legal secretary in defendant National Super Markets's legal department when she was fired by defendant Kim Luther, the head of the department and plaintiff's immediate supervisor. She brought this action in two counts, alleging that the circumstances attending her discharge were actionable as outrageous conduct and as a prima facie tort. She appeals from the trial court's ruling which sustained defendants' motion for summary judgment on both counts. We affirm.

Initially it is important to note that the trial court's ruling involved a motion for summary judgment rather than a dismissal based solely on the pleadings. *Compare Young v. Stensrude*, 664 S.W.2d 263 (Mo. App.1984). In addition to the pleadings, the record in this case consisted of plaintiff's deposition and defendant Luther's deposition. We therefore review the proof before the trial court within the standard of Rule 74.04. *See e.g. First National Bank of St. Charles v. Chemical Products, Inc.*, 637 S.W.2d 373 (Mo.App.1982).

Plaintiff was at home on the first day of a two-day vacation when she saw an ad for employment in a local newspaper by a lady with paralegal experience. Plaintiff knew that National had been looking for additional help for its legal department for nearly a month. Plaintiff, on her own initiative, telephoned the advertiser because she "sounded like what the law department was interested in." During the ensuing telephone conversation, plaintiff told the advertiser that she could expect to make at least four dollars per hour working in the legal department and offered to bring the ad to the attention of defendant Luther. The advertiser agreed and plaintiff called the legal department at National. Defendant Luther was out of the office, so plaintiff advised "Dan," the only other lawyer in the department, of the ad and of her conversation with the potential employee.

When plaintiff returned to work the next week, defendant Luther summoned her to his office and closed the doors to the hallway and to Dan's adjoining office. Plaintiff testified at her deposition that the following then transpired:

A First, he called me in the room and said something to the effect that I had talked to a girl about an opening, and I remember he hollered, 'Dammit, you've

done it again,' and I just kind of looked at him, and he said how wrong it was that I should talk to someone about a position in our department * * * without talking to him, and I stated that I had called for him, he was not in the office, and at the time I read the ad in the paper to Dan and Dan thought that the ad sounded good, and he says, 'Dan doesn't know a goddamm thing,' and his face got very red, and at this point I couldn't talk. I got so upset that I just sat there.

Q Was that the substance of that conversation?

A Well, he stated that I was wrong and if I couldn't admit, if I wouldn't admit I was wrong, that I didn't belong in the department, and I don't know how many times he said this, and I said, 'Well, I just told the girl about an opening in the department,' you know. I told her that he would contact her if he was interested, and he did contact her and that was it, and I didn't know what was so wrong that I should say that I was wrong, and he just said it was wrong, and I didn't belong in the department if I wouldn't admit it, and I said, 'Are you asking me to leave,' and he said, 'Yes, I guess I am,' and so I thought, well, if that is what he wanted, and I offered to finish typing his dictation before I left, and he went and got my paycheck and told me to go ahead out.

Q And those were the exact words that were said, according to you?

A Yes, sir.

■ Plaintiff alleged that she suffered "severe mental pain, anguish, embarrassment, shock, fright, humiliation and distress" as a consequence of the encounter in defendant Luther's office. The particulars according to her deposition testimony were that she had cried about being discharged, had lost some sleep over it, and for a time had been unable to concentrate on watching television. Also following her discharge, she testified that her stomach began "hurting and churning inside, but it wasn't severe to the point where I felt like

I had to go to the doctor." Plaintiff was unemployed for approximately two months.

In *Pretsky v. Southwestern Bell Telephone Co.,* 396 S.W.2d 566, 568–69 (Mo. 1965), the Supreme Court approved the position taken by the Restatement (Second) of Torts § 46(1) (1965) (hereafter Restatement) that "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and if bodily harm to the other results from it, for such bodily harm."

Concerning defendant Luther's conduct, "[i]t is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so." Restatement § 46 comment h.; *Wilt v. Kansas City Area Transportation Authority,* 629 S.W.2d 669, 671 (Mo.App.1982). The test for actionable conduct is that it must be "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement § 46 comment d.; and *see United Tel. Co. of Missouri v. Horn,* 610 S.W.2d 701, 704 (Mo.App.1980). Luther's conduct, though not above reproach, cannot be characterized as so extreme and outrageous as to be tortious. As the Restatement observes: "The rough edges of our society are still in need of a good deal of filing down, and in the meantime plaintiffs must necessarily be expected and required to be hardened to a certain amount of rough language, and to occasional acts that are definitely inconsiderate and unkind." Restatement § 46 comment d.

It is also for the court to determine, in the first instance, whether on the evidence severe emotional distress can be found, Restatement § 46 comment j.; that is, distress "so severe that no reasonable man could be expected to endure it." *Id.;* and *see United Tel. Co. of Missouri v. Horn,* 610 S.W.2d at 704. Though granting that plaintiff suffered and may still suffer from

emotional distress, it is not to the degree that an action for outrageous conduct will lie.

The trial court properly granted defendants' motion for summary judgment on count one of plaintiff's petition.

The second count of plaintiff's petition characterizes the same conduct of defendant Luther as a "prima facie tort," the elements of which we set out in *Boyer v. Carondelet Sav. & Loan Ass'n*, 633 S.W.2d 98, 100 (Mo.App.1982): "(1) intentional lawful act by the defendant; (2) an intent to cause injury to the plaintiff; (3) injury to the plaintiff; and (4) an absence of any justification or an insufficient justification for defendant's act." We need proceed no further than element (2), because there is no direct evidence nor could one reasonably infer from the evidence that Luther acted with the specific intent to injure plaintiff.[1]

Affirmed.

KAROHL, P.J., and REINHARD, J., concur.

---

1. Recognition of the prima facie tort doctrine in Missouri stems from *Porter v. Crawford & Co.*, 611 S.W.2d 265 (Mo.App.1980), wherein the court concluded at 272 that the Restatement (Second) of Torts § 870 (1979) supplies a workable guide for application of the doctrine. Restatement § 870 comment i. implies that specific intent to injure is required: "For some torts it may be held not to be sufficient that the actor knew that his conduct was substantially certain to produce the injury, and it may be necessary that he desired to bring it about."