**John and Sandra DOWD, Respondents,**

**v.**

**GENERAL MOTORS ACCEPTANCE CORP., Defendant-Appellant.**

**No. WD 35342.**

Missouri Court of Appeals,
Western District.

Dec. 4, 1984.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied
Jan. 29, 1985.
Application to Transfer Denied
April 2, 1985.

Linda Virginia Gill of Gage & Tucker, Kansas City, for defendant-appellant.

Donald A. Witt, Platte City, for respondents.

Before TURNAGE, C.J., and SHANGLER and MANFORD, JJ.

MANFORD, Judge.

This is a civil action seeking actual and punitive damages upon a four-count petition presenting alternate theories of negligence, gross negligence, fraud, and prima facie tort. The claim was submitted upon prima facie tort. The jury returned a verdict for $90,000 upon which the court entered judgment. The judgment is reversed.

Appellant, General Motors Acceptance Corporation (hereinafter G.M.A.C.) was the original defendant at trial. Respondents, original plaintiffs at trial, are John and Sandra Dowd (hereinafter the Dowds).

G.M.A.C. has presented no less than thirteen points before this court. Due to the disposition of this appeal, only two of those points are taken up. G.M.A.C. alleges that the trial court (1) erred in overruling its motion for judgment N.O.V., because the Dowds failed to make a submissible case of prima facie tort, and (2) erred by abusing its discretion in awarding attorneys fees to the Dowds because G.M.A.C. was not in default of any deadline set by the court, nor was such award based upon the sustaining of any motion for sanctions.

John and Sandra Dowd were, at the time of trial, residents of Weston, Missouri. In December, 1979, the Dowds purchased from Girner Motors in St. Joseph, Missouri, a 1980 Honda Civic automobile. As part of the purchase, the Dowds executed an installment sales contract which was assigned to G.M.A.C. During 1980, the Dowds made payments to G.M.A.C. Since John Dowd changed employment and in contemplation of having use of a company vehicle in his new sales position, the Dowds decided to sell the 1980 Honda. In December, 1980, the Dowds requested a relative, one Carlos Anderson, to negotiate a sale of the Honda. Anderson contacted one Johnny Allred, a used car dealer in Knob Noster, Missouri, and Allred agreed to purchase the Honda. The terms of the Allred purchase were simple, providing only a payment of $4,000.00 by a check which contained the words, "title attached." The check was delivered to the Dowds and the Honda to Allred. The evidence revealed that the Dowds were not aware of any time limitation related to the sale/purchase to Allred. The Allred check was received by the Dowds on January 18, 1981, and John Dowd took the check to G.M.A.C. on January 19, 1981 to complete payment of the indebtedness owed G.M.A.C.

At the G.M.A.C. office, John Dowd met with an employee of G.M.A.C., Betty Coussens. No discussion was had regarding any time limitation on the sale, or that a *signed title* to the Honda was to be attached to the Allred check. It was Coussens' understanding that the term "title attached" indicated that she, on behalf of G.M.A.C., could and should release the G.M.A.C. lien on the certificate of title to the Honda and in turn attach the certificate of title to the Allred check. Discussion between Coussens and John Dowd included Dowd's inquiry of whether or not he should sign the title. Coussens advised John Dowd that signature was not necessary as Allred probably had a power of attorney. Coussens released the G.M.A.C. lien the same day (January 19, 1981), and told John Dowd that she would attach the certificate of title to the check and forward it to Allred via the necessary bank deposit and

clearance. Coussens also advised John Dowd that he would receive within a week or so a check for the difference between the sale price and the balance owed G.M.A.C., along with a copy of the installment contract stamped paid.

On January 21, 1981, G.M.A.C. deposited the Allred check with the title certificate attached. The depositing bank sent the Allred check to the collecting drawee bank on January 22, 1981. On January 27, 1981, the depositing bank received from the drawee bank the check, certificate of title attached, and a memo of non-acceptance of the check because the Dowds, as sellers, had not signed the title certificate. On the same date (January 27, 1981), the depositing bank sent the check with the Certificate of title attached to G.M.A.C. G.M.A.C. called the Dowds and on January 29, 1981, the Dowds went to the G.M.A.C. office and signed the certificate of title. The evidence revealed that employees of G.M.A.C. were polite and apologized to the Dowds for having to have them return to sign the title. An employee of G.M.A.C. also informed the Dowds that G.M.A.C. was unaware that the title had to be signed. The check with the title attached was redeposited by G.M.A.C. on January 30, 1981, and the depositing bank resubmitted the check with title to the drawee bank on February 2, 1981. On February 2, 1981, Allred contacted John Dowd, advising the latter that he had not received the signed title. Allred further advised Dowd that if the title was not received by February 3, 1981, he (Allred) would stop payment on the check. The "time limit" imposed by Allred on February 2, 1981 was never disclosed to G.M.A.C. by John Dowd. On February 4, 1981, Allred stopped payment on the check. In the meanwhile, the Dowds had received from G.M.A.C. a check in the sum of $206.86 representing the difference between their loan balance and the sale price ($4,000.00) of the Honda, along with a copy of the installment contract stamped paid.

The Allred check was returned to G.M.A.C. The credit manager for G.M.A.C. contacted the Dowds, advising them of the return of the check. The credit manager requested the Dowds to pick up the Honda and return the $206.81 check, and to continue their payments under the installment contract. Upon the Dowds' refusal, they were advised that the $206.81 amount would be added back to their loan, crediting a delinquency of $83.50 for the November payment. There followed several collection letters that were sent the Dowds by G.M.A.C.

On February 16, 1981, an attorney for the Dowds wrote to G.M.A.C. stating that the Dowds believed they had no liability to G.M.A.C. because they were in possession of a stamped paid note. The credit manager for G.M.A.C. testified that it is likely someone called the Dowds' attorney and tried to resolve the matter. The Honda was repossessed by G.M.A.C. on February 18, 1981 after written notice of the repossession to the Dowds. When the Honda was sold, it left a deficiency of $496.24 on the loan. The Dowds were requested by G.M.A.C. to pay the deficiency, but the Dowds refused. G.M.A.C., rather than pursue the Dowds on the deficiency, charged the amount to profit and loss as a bad debt. This decision was reached upon G.M.A.C.'s concluding that the deficiency was too small to warrant the expense of collection, plus a potential cross-claim by the Dowds. On its books and records, the deficiency was recorded by a "Form 565", which included a notation "Responsibility for Deficiency—Customer Not Responsible —G.M.A.C. Decision." Testimony at trial defined the meaning of the foregoing wording as a decision by G.M.A.C. not to attempt collection of the deficiency from the Dowds.

On February 27, 1981, G.M.A.C. applied for a repossession title from the Missouri Department of Revenue. This application was accompanied by the required affidavit, which noted that repossession was based upon a default in payment of the installment loan. The Honda was sold on March 30, 1981. G.M.A.C. then reported to the Kansas City Credit Bureau, of which it is a member, that the $496.24 had been written off to profit and loss on the Dowd account.

The testimony revealed that the foregoing procedures are normal and routine.

It was established that the G.M.A.C. statement to the Credit Bureau was accurate and true. It was also established that G.M.A.C. knew that in reporting the matter to the Bureau, the Dowds would receive what was called a PRL[1] rating from the Credit Bureau, and G.M.A.C. knew that such rating would "probably" injure the Dowds' credit rating.

In July, 1981, the Dowds applied for credit with the Montgomery Ward Company. There was no plan by the Dowds to make a specific purchase at Wards. At this same time, the Dowds were in possession of valid Visa and Mastercard credit cards. Wards, as a credit practice, accepts Visa and Mastercard for purchases. Pursuant to the Dowds' application for credit, Wards made inquiry of the Credit Bureau, the PRL rating relative to the G.M.A.C. loan was revealed, and Wards turned down the Dowds' application. Subsequently, the Dowds received credit cards from Amoco and Sears, Roebuck & Co., in addition to the approval of a loan from the Bank of Weston. The only denial of credit to the Dowds was the Wards application. The Wards inquiry concerning the Dowds' application did not include a review of the repossession affidavit filed by G.M.A.C. with the Missouri Department of Revenue.

It was determined that the records of the Credit Bureau are open for inspection by anyone concerning his or her personal credit standing. In addition, any person who, after review of his or her credit file, has a disagreement with the information in such file may, in turn, file of record a statement of his or her account of the issues relative to the credit dispute. The Dowds did not enter any statement or account of the G.M.A.C. report until June, 1982. When they filed their statement, the file with the Credit Bureau was changed from a PRL designation to a "DRP" designation.[2]

The Dowds testified that they lost time from their employment. John Dowd testified that he lost 1½ days and Sandra Dowd stated that she lost a half of a day. Neither testified as to any lost wages or other expenses. The Dowds testified that a good credit standing is very important to them, and John Dowd testified that it "just hurts me to think I would have a bad mark on my credit."

Venue in this case was challenged by G.M.A.C., but subsequently on a motion by G.M.A.C., this cause was transferred to Clay County.

Prior to trial, relative to the production of documents (Tax return and a branch office manual), the Circuit Court of Clay County ordered G.M.A.C. to pay the sum of $2,000.00 in attorneys fees to counsel for the Dowds. The events leading to this order of payment of attorneys fees is as follows: The circuit court had ordered G.M.A.C. to produce the manual and the tax return within twenty days of its order dated July 21, 1982. The order provided production in camera.[3] During the twenty-day period, G.M.A.C. filed a writ of prohibition regarding the circuit court's order to produce. This court denied the writ on August 13, 1982. A motion for sanctions against G.M.A.C. was filed by the Dowds on August 31, 1982, and the motion was heard on September 7, 1982. Following that hearing, the circuit court ordered production of the documents by October 7, 1982. The order was for production "in camera." On October 7, 1982, the circuit court was on vacation and G.M.A.C. filed a motion to extend the time in which to comply with the October 7, 1982 order until October 20, 1982, or in the alternative, to conduct a hearing on the motion to extend or to vacate the previous order of October 7, 1982. The motion to extend the time was granted and G.M.A.C. was allowed until October 20, 1982 to comply. Meanwhile,

---

1. By testimony, the "PRL" designates an account as a profit and loss write-off account.

2. "DRP" was defined as "disputed resolution pending."

3. Such production was ordered "in camera" because of the confidential nature of the corporate tax return of G.M.A.C.

the Dowds had filed a motion for default judgment, and this motion was overruled. The motion for sanctions were never sustained. G.M.A.C. filed the documents on October 20, 1982. The circuit court, while denying the Dowds' motion for default judgment, did award them attorneys fees of $2,000.00 in connection therewith.

The case was submitted to the jury under instruction upon the theory of prima facie tort. The jury returned a mixed verdict of actual and punitive damages for both John and Sandra Dowd in the total sum of $90,-000.00. This appeal followed the overruling of timely filed post-trial motions. In addition, facts deemed pertinent will be related within the discussion relative to the disposition of this appeal infra.

Under point (1), G.M.A.C. charges that the trial court erred in overruling its motion for judgment N.O.V. because the Dowds failed to make a submissible case under the doctrine or theory of prima facie tort.

The procedural correctness to have preserved and on appeal raise the challenge to the trial court's failure to grant G.M.A.C.'s motion for judgment N.O.V. is not challenged on this appeal.

■ Missouri has adopted the prima facie tort theory. *Porter v. Crawford & Co.*, 611 S.W.2d 265 (Mo.App.1980). *Porter* is considered by some to be the initial case on the adoption of the theory, but a careful analysis of the history of the doctrine reveals that it was presented much earlier than *Porter*. See *Bandag of Springfield, Inc. v. Bandag, Inc.*, 662 S.W.2d 546 (Mo. App.1983). The history and analysis of the doctrine can be reviewed by those interested in reading *Bandag* and *Porter*, and no purpose would be served by repeating that history and analysis herein. Another major decision which, for purposes herein, needs to be considered is this court's ruling in *Lundberg v. Prudential Ins. Co.*, 661 S.W.2d 667 (Mo.App.1983). In *Lundberg*, as contrasted with *Bandag* and *Porter*, this court directed its attention to and thus determined as an issue, the evidentiary sufficiency that is requisite in a case premised upon the prima facie tort theory or doctrine. From *Bandag, Porter*, and *Lundberg*, well defined and prescribed rules have emerged. It is against those rules that disposition of the present case is achieved.

■ Requisite elements to establish a claim upon the prima facie tort theory or doctrine include (1) the committing of an intentional lawful act by the defendant, (2) an intent to cause injury to the plaintiff, (3) the resulting injury to the plaintiff, and (4) an absence of any justification or an insufficient justification for the defendant's act. *Porter, supra. Bandag* carried the prima facie tort theory one step further in declaring where a plaintiff has a claim within a well defined nominated tort action, then such claim cannot be submitted under the prima facie tort theory or doctrine. In *Lundberg*, one observes a further refinement of the prima facie tort theory or doctrine well beyond the considerations in either *Porter* or *Bandag, supra*. This court in *Lundberg*, after first recognizing and restating the requirement of the commission of an intentional lawful act, went on to declare that the second element of a prima facie tort, to wit an "intent to cause injury to the plaintiff", must be upon proof thereof an "actual intent". This court, 661 S.W.2d at 670, held:

"The second element of a prima facie tort is '[a]n intent to cause injury to the plaintiff.' *Porter v. Crawford & Co.*, 611 S.W.2d at 268. Proof that defendant intentionally did the lawful act in question (the first element), even if accompanied by proof that plaintiff was injured (the third element) and that there was an absence of justification or an insufficient justification for defendant's act (the fourth element) does not make a submissible case. Plaintiff carries an additional burden, albeit a heavy one to shoulder, of proving an 'actual intent' on defendant's part to *injure* plaintiff, not merely an intent to do the act purportedly resulting in the claimed injury."

■ Further, *Porter, Bandag,* and *Lundberg* declare that in determining whether a defendant's actions are tortious, the courts must apply a "balancing of interests" test which includes four elements, which are (1) the nature and seriousness of the harm to the injured party, (2) the interests promoted by the actor's conduct, (3) the character of the means used by the actor, and (4) the actor's motive." *See also* Restatement of Torts 2d, § 870. The foregoing elements, the official comments to the Restatement of Torts, declare (relative to element) (1) the physical harm to person or property is weighed more heavily than emotional harm or harm to prospective pecuniary interest, (2) established privileges or rights of the actor are to be afforded proper weight, (3) conduct which offends societal concepts of fairness and morality favor liability, and (4) the degree of malice motivating the actor may be so overwhelming as to tip the scales in favor of liability. *Lundberg,* 661 S.W.2d at 671.

As noted in *Lundberg,* " '[t]he balancing of interests' like so many legal guidelines is easier to articulate than to implement." Nonetheless, that is the responsibility of this court as confined by the evidence presented by the particular case under consideration. One more note should be made, with particular reference to *Lundberg,* in that this court expressed "a legitimate concern has been whether the prima facie tort doctrine would be shaped into a well-defined tort category with clearly etched boundaries or whether it would be an abstraction presaging a cause of action under the facade of a tort for every situation where none previously existed." *Lundberg,* 661 S.W.2d at 670. Stated another way and certainly without the eloquence of the foregoing passage, it can be said that there exists real concern that this doctrine, in its development, be in turn well defined as a particular tort which clearly describes the fault or failure of responsibility which is to serve as the basis for recovery so as to preclude its use and application as a mere social practice for recovery simply upon the sheer allegation of any injury or loss.

In disposing of point (1), this court need only look to element number two of the doctrine, "an intent to cause injury to the plaintiff", and how that element has been ruled in *Lundberg.* There is no need, under the facts and circumstances of the instant case, to proceed further in applying the "balancing test" as prescribed by *Porter. Lundberg* notes that before the "balancing test" be applied, it must first be determined if a claimant has presented a submissible case which includes all four of the elements of a prima facie tort.

■ Respondents point out correctly that review by this court is limited to a review of all the evidence and reasonable inferences therefrom which is favorable to the verdict and any evidence submitted by appellant must be excluded except that which supports the verdict. That is the correct standard in review of those cases charging that the trial court erred in denying a party's motion for judgment N.O.V. *Bayne v. Jenkins,* 593 S.W.2d 519 (Mo. banc 1980).

■ G.M.A.C. asserts that the record lacks any evidence that it intended injury to the Dowds. G.M.A.C. further asserts that the evidence is undisputed that it both desired and attempted to persuade the Dowds to reclaim the Honda and continue their payments. G.M.A.C. further notes that repossession and sale of the Honda occurred only after refusal to reclaim the Honda and to resume payments by the Dowds.

The record is absolutely clear that the Dowds both received correspondence from G.M.A.C. and had conversations with representatives of G.M.A.C. relative to the return of the Allred check, the reclaiming of the Honda and resumption of payments to G.M.A.C. by the Dowds. The evidence further reveals that the Dowds were aware that their refusal to reclaim the Honda and resume payments would result in repossession and sale of the Honda.

The evidence further reveals that the collection efforts, repossession, sale, and charge-off of the claimed balance was a routine procedure. As part of this routine

procedure, a report is made by G.M.A.C. to the Credit Bureau. The evidence herein does go wanting to establish that G.M.A.C. actually intended to injure the Dowds.

In contrast, respondents claim that the evidence established that G.M.A.C. submitted the unfavorable credit report to the Credit Bureau, and because they intended the act they intended the natural result, i.e., the damage to this credit rating. But the requirement is that the Dowds prove an actual intent to injure them. As stated in *Lundberg* the intent to do the act is not sufficient. It is the critical intent to cause injury which must be proved. The evidence in this case does not show any actual intent to cause injury. In addition, the admission by a representative of G.M.A.C. that he knew the report to the Credit Bureau would be an "adverse credit report" does not suffice to establish actual intent to injure by G.M.A.C., particularly in view of the completely accurate nature of the report.

Additionally, the Dowds contend that the intent to injure is established by G.M.A.C.'s seeking and obtaining by affidavit a repossession title to the Honda. It is the Dowds' position that G.M.A.C. already had the certificate of title signed in blank by the Dowds. They also assert that G.M.A.C. had only to insert the name of the ultimate purchaser, and the election to secure a repossession title from the Missouri Department of Revenue is evidence of intent to injure. Not only does the obtaining of a repossession title fail to establish or provide evidence of an intent to injure, but additionally what the Dowds suggest is that G.M.A.C. should have committed an act prohibited by Missouri law. The transfer of certificates of title to motor vehicles in blank is a prohibited act and such practice places any such title in real doubt as to its validity. *State v. Glenn*, 423 S.W.2d 770, 774 (Mo.1968), § 301.210, RSMo 1978.

Contrary to the argument of the Dowds that G.M.A.C.'s action in obtaining a repossession title proves an intent to injure, the exact opposite is revealed upon the record herein, that being not only was the obtaining of a repossession title in accord with Missouri law, but it is a routine procedure followed by G.M.A.C. in such collection matters and was not undertaken to injure the Dowds or their credit standing in any manner.

While the Dowds' attempt to make much ado over the company operational manual of G.M.A.C. which directs that accounts in dispute should not be reported to the credit bureau, they overlook some important facts developed by the evidence. In the first instance, the record reveals that G.M.A.C. never considered the Dowd account a "disputed account", but rather, merely an account written off to profit and loss as an unpaid account. The account never became a disputed account between G.M.A.C. and the Dowds. What occurred was that the Dowds, as they were permitted to do, posted a statement of their side of the controversy with the Credit Bureau and upon the Credit Bureau records, the matter was changed from a PRL matter to a disputed claim. Moreover, this action by the Dowds occurred subsequent to the credit denied by Wards. It cannot be said that G.M.A.C. acted contrary to its own operational guidelines, and it certainly cannot be concluded that these events establish an actual intent to injure by G.M.A.C.

The evidence herein simply fails to establish by substantial evidence that G.M.A.C. actually intended to injure the Dowds as that requirement is prescribed by *Lundberg*.

The Dowds further assert that intent to injure can be established by inference from the particular facts and circumstances of a given case, and from that argue that a person is presumed to intend the natural and probable consequences of his act. From this, they posture that *Lundberg* rules that when an intentional act results in injuries which are the natural probable consequences of the act, then the injury, as well as the act, is intentional. The Dowds cite to *Truck Ins. Exchange v. Pickering*, 642 S.W.2d 113 (Mo.App.1982) and *Subscribers at Automobile Club Inter-Insurance Exchange v. Kennison*, 549 S.W.2d

587 (Mo.App.1977), neither of which control herein.

The Dowds misread *Lundberg* on this point. *Lundberg* points out that the plaintiff has the heavy burden of proving "actual intent" to injure. In considering this actual intent, this court reviewed the record for disclosure of "spite or ill will" by the defendant. In addition, in the earlier decision of *Bandag*, the court used the term malice, and finding none ruled there was no intent to injure. What the Dowds really assert is that if a lawful act is undertaken and a party claims injury thereby, the claim is actionable. This is not the rule. The "intent" addressed in *Bandag* and *Lundberg* is the "intent to injure", not an "intent to act."

The evidence herein clearly reveals that G.M.A.C. intended to act. That is, as part of its normal collection procedures, it intended to repossess and sell the Honda and to employ efforts to collect the deficiency due under the sales contract. When those efforts failed relative to the collection of the deficiency, G.M.A.C. wrote that deficiency off to profit and loss. Since G.M.A.C. has an interest as a lender in the credit relationship with customers along with other lenders, it reported the status of the Dowd account to the Credit Bureau. This is, as the evidence revealed, a normal routine credit practice.

Reviewing both the pleadings and the evidence most favorably to the Dowds, it must be concluded that the evidence herein fails to provide substantial proof that G.M.A.C., by its conduct, intended injury to the Dowds. It was, at all times, agreed by the parties herein that personnel of G.M.A.C. treated the Dowds with courtesy.

As an added note, there is absolutely no evidence upon this record that either of the Dowds suffered any damages. Mrs. Dowd, in taking a brief time from her job in the circuit clerk's office, lost no time or wages. Mr. Dowd, who was in the sales field, could not testify to any loss of income from his having to return to the G.M.A.C. office to sign the title.

G.M.A.C.'s point (1) is sustained to its favor upon the trial court's failure to have sustained G.M.A.C.'s motion for judgment N.O.V.

■ Under G.M.A.C.'s point (2), it is contended that the trial court abused its discretion in awarding attorney's fees to the Dowds since G.M.A.C. was not in default of any deadline set by the court, nor was such award the result of the sustaining of any motion for sanctions.

In brief summary, the events surrounding this issue are as follows.

The Dowds, by discovery, sought disclosure of the net worth of G.M.A.C., along with the operational manual of G.M.A.C. G.M.A.C., well within its right to do so, resisted such disclosure. The Dowds in turn sought sanctions along with a declaration of default against G.M.A.C. A date was set by which G.M.A.C. was to comply. On that date, the court was on vacation and the date was extended. G.M.A.C. complied and filed the requested documents. When the matter was finally taken up by the trial court, it not only failed to rule the Dowds' motion for sanctions, but it denied their request for default judgment. Then the same trial court found the Dowds entitled to $2,000.00 in attorney's fees. What was pending before the court was the Dowds' motion for default which the trial court specifically denied. In the same ruling, the court awarded attorney's fees.

This court not only finds such action inconsistent, but rules that the award of attorney's fees was an abuse of discretion.

G.M.A.C.'s point (2) is sustained to its favor upon a finding that the trial court abused its discretion in awarding the Dowds the sum of $2,000.00 in attorney's fees.

In conclusion, the judgment herein is reversed. In addition, the award of attorney's fees in the sum of $2,000.00 is reversed.

All concur.