Lisa C. KIPHART, Plaintiff-Respondent,

v.

**COMMUNITY FEDERAL SAVINGS &
LOAN ASSOCIATION,
Defendant-Appellant.**

No. 51267.

Missouri Court of Appeals,
Eastern District,
Division Five.

March 24, 1987.

Motion for Rehearing and/or Transfer
Denied April 29, 1987.

Application to Transfer Denied
June 16, 1987.

Ray Dickhaner, Wegmann, Gasaway, Stewart, Schneider, Dickhaner, Tesreau & Stoll, P.C., Hillsboro, for defendant-appellant.

Douglas P. Dowd, Dowd & Dowd, P.C., St. Louis, for plaintiff-respondent.

SIMEONE, Senior Judge.

## I

This is an appeal by defendant-appellant, Community Federal Savings & Loan Association, from a judgment entered on November 5, 1985 by the circuit court of the City of St. Louis in favor of the plaintiff, Lisa C. Kiphart for $15,000 actual damages and $75,000 punitive damages for emotional injury under the theory of prima facie tort.

For reversal, appellant contends that the trial court erred in (1) overruling its motion for directed verdict and motion for judgment n.o.v. because (a) plaintiff's exclusive remedy, if any, is under the provisions of the workers' compensation law, (b) plaintiff did not make a submissible case of prima facie tort, and (2) the court erred in giving an instruction which improperly defines "malice" so as to authorize an award of punitive damages. For reasons hereinafter stated, we reverse.

The principal issue to be resolved is: whether the plaintiff established a submissible case of prima facie tort. The other incidental issues are resolved by the resolution of this principal one and need not be discussed in detail.

## II

Lisa Carmen Kiphart, an eighteen year old woman, accepted a full-time position as a teller with Community Federal Savings & Loan Company soon after graduation from high school in 1981. Community Federal is a savings and loan institution with its central office in Manchester, Missouri. In March and April, 1982, at the time of the events in dispute, there were at least eight tellers, including Lisa and Dianne Powell, at windows taking and dispensing money and servicing customers. Ms. Lois Willis was the head teller; Linda Novy was assistant manager in charge of teller security and their immediate supervisor; Chris Helle was the manager; John S. Crosby was the senior vice president in charge of personnel and security, and Robert L. MacNaughton was an "investigator" for the organization under the authority of Mr. Crosby.

The tellers, in order to service the customers, would start out the day with a certain amount of money in different denominations, and, as needed during the day, would "buy" and "sell" money from and to Lois Willis. Each teller had a "drawer," which when not in use and at the end of the day, was kept in a vault room. Money would be "bought" and "purchased" from the head teller as the need arose, and specific records were kept by each teller of each transaction according to the denomination of bills "bought" and "sold." The records of each teller and the records of the head teller were balanced at the end of each day.

The chain of events resulting in this action began at the end of the day on March 30, 1982. When Lois Willis attempted to balance her "working fund" regarding the various denominations of bills "bought" and "sold" that day, she found that there was a $200 discrepancy in her accounts. She notified Linda Novy. Lois knew from the records of each of the tellers the various denominations of bills which were used, and by a process of elimination concluded that it could only be five dollar bills which caused the discrepancy. Only Lisa Kiphart and Dianne Powell had purchased five dollar bills that day. Lisa's "working fund" record for that day, a copy of which was introduced as an exhibit, showed as to the purchase of five dollar bills the figure "$460," although the "60" was written over by another number—possibly "$35." From

approximately 5:15 p.m. to after 6:00 p.m., Ms. Willis and Linda Novy audited Lois's cash drawer to attempt to locate the discrepancy. They checked the records and found that Lisa and Dianne were the only ones to receive five dollar denominations and they went into the vault to examine the cash drawers of Lisa and Dianne. Ms. Novy counted the cash in Lisa's drawer and found out that Lisa's cash was "off by twenty-five dollars." When she counted the fives, she "came up with four hundred thirty-five dollars instead of the four hundred sixty on that [working fund] sheet." They looked throughout the whole teller area for the missing money, searching the vault completely, looking in the cash drawers and underneath the teller terminals and even in the trash cans. The next morning they reported the matter to the auditing department. Chris Helle, the manager, counted Lisa's drawer again, while Lisa watched. The drawer still showed "$25.00 off."

The next morning, March 31, 1982, when Lisa Kiphart came to work, she was asked whether she knew she was $25.00 off. Lisa said, "No." After all the drawers were counted, everyone returned to work at their stations except Lisa. She was told to sit by the supervisor's desk. She sat there until after lunch time. She was then advised by Ms. Novy to go to the fourth floor because they wanted to "speak to me." Lisa went to a small 10' × 12' all-purpose room with no windows and was interviewed by Mr. MacNaughton. According to Lisa's testimony, Mr. MacNaughton's "demeanor" was "accusative." A tape of the interview was played to the jury. MacNaughton began the interview by telling Lisa "[n]ow to be quite candid about it, I may as well lay the cards on the table. The total amount we're talking about is not $25. The amount, as near as we can determine, is $225." He informed Lisa of several facts: stealing over $150 is a felony; the funds in Community Federal are insured by the federal government, "which technically places any theft under the jurisdiction of the FBI; if necessary, 'I' will refer the case to the Federal Bureau or other agencies." He stressed to Lisa that

she realize there are "implications herein." When asked if she "balanced" last night when she closed, Lisa replied, "I thought I did." He told her that another employee noted that when she put her cash drawer away, she was in the vault "what seemed a long time" and she had a purse with her, and was "zipping it up" when she came out. He informed her that purses are not to be taken into the vault. However, there were no written rules to this effect, and apparently other tellers do so. Lisa admitted taking her purse into the vault. McNaughton also informed her that she was one of only two tellers who had $5's in packages of $100's, and that one got $200 too much. He also told her of the policy that one does not leave work if there is an imbalance and that such imbalance should be reported. "To be quite honest about it, if I have to put in just so many words, I am offering you a way out ... providing that you received $200 too much, there's a way to return it and maybe all that happens is that they might let you go from employment,.... On the other hand, if it's found later that you received this money ... and the money is not recovered, then it opens you to criminal prosecution." He then told her that in cases of this kind that it was a policy to request that a person voluntarily submit to a polygraph examination. He explained to her how the examination would be conducted. Lisa consented to the polygraph examination. McNaughton told her that if the results were unfavorable, "we'll get together on that." He also informed her that he was a former "FBI" or "OSI" (the tape is inaudible) agent, and that he recently completed a series of cases where one young lady "drew" one year in the county jail and one lady went to jail for seven years for similar offenses. Near the end of this first interview, he told her that if she wished to make a "clean breast" of it, she should get in touch with him. He concluded:

This may sound strange to you but I have grandchildren older than you, so I realize too that young people get into situations sometimes that are regrettable but understandable, so I'm not out for blood. I'm just out to solve the facts and

get the return of the money to the association and only for prosecution if there appears to be no other way.... We are principally concerned with recoupment of the money and less publicity....

This interview lasted some 45 minutes. During the latter part of the interview, Lisa was on the verge of crying, and was upset and crying when she returned to work. Linda Novy saw she was upset and suggested Lisa go home for the day. That night she tossed and turned and couldn't sleep. Over a period of some two months she lost ten pounds.

Mr. MacNaughton also interviewed Dianne Powell. She also consented to a polygraph examination.

The next day, April 1, 1982, Lisa and Dianne took the polygraph. Herbert Wilhelm, a certified polygraphist, conducted the examinations. Wilhelm's report concluded that it was his opinion that Lisa was "not truthful" in the information furnished.[1]

After the examination, she returned to work.

On April 2, Lisa went to work. About 10:00 a.m., Ms. Novy told her that MacNaughton wanted to speak to her. She went to the fourth floor again, along with Dianne. MacNaughton then interviewed her a second time. At this interview, MacNaughton began by telling Lisa, "quite flatly" that her polygraph test "was not good and neither was Dianne's." Lisa began to cry. After a few more questions, MacNaughton told her that "one of you did it and the other knows about. ... Now as far as I'm concerned as an investigator, that makes you both equally guilty ... I don't want to see anyone go to jail. That's very likely what's going to happen here, if we have to take it to the prosecution." Lisa replied, "[w]ell take it to the prosecution because I'm not guilty. Do whatever you want." She insisted she did not take the money. He asked her whether she had thought what this was going to do to her

family, and she replied, "I haven't done anything wrong and it isn't going to do anything to my family." MacNaughton replied "[y]ou can deny it with your mouth, but you can't deny it with your physiological reactions." She insisted that she "honestly" didn't know she was $25 off on March 30. When asked "[w]hat do you think is going to happen as a result of this," Lisa replied "not a God damn thing because I didn't take any money." Near the end of the interview MacNaughton said:

> If you are not the one that took it, I'm offering you a chance to save yourself. If you did take it, I'm offering you an easier road out than you are going to get with the federals. Now that's strictly all there is to it, and this is not a bluff in any way ... The last one got seven years. You're not doing yourself any good, Lisa.

Lisa replied, "I didn't do anything wrong and so there isn't nothing [sic] I can tell you."

Near the end of this interview, MacNaughton stated:

> [B]ut I am going to tell you, and anyone else in this organization that's had anything to do with me will likewise tell you, that I will not quit. And you are not going to walk home free. You are not, one way or the other. It just depends on you—how severe it is, whether you're merely released from our employment or whether you're released ... and prosecuted on top of that ... Now that I tell you flatly.

He then told her that he had "great admiration for your mother's people ... I know the pride they have in the family ... This is going to be quite a blow to them." When Lisa left she was in tears. She called her mother. Linda Novy told her she could go home because she was crying and upset.

Between April 2, and April 14, nothing of significance occurred. On that date, Mac-

---

**1.** His report stated that she reacted to the following questions:

"Did you take the $200 missing from the fund"? Answered, "No."

"Since this money's been missing, have you had it in your possession"? Answered, "No."

"Could you take me now to this missing money"? Answered, "No."

Naughton wanted to interview her and Diane again. Lisa told him she wasn't going to talk anymore. "Arrest me or fire me, do whatever you're going to do. I didn't take any money." Sometime later, Mr. Crosby called her in the office. She said she was not going to answer any more questions, that she had come to the end of her patience. He told her that he had no choice but to terminate her for refusing to cooperate with the investigation, "not for stealing, but for refusing to continue with the final step." Mr. Schafer, the branch coordinator was present. It was his duty to recoup keys and ID cards. Crosby asked her to go back downstairs and balance out her cash drawer. Lisa replied, "you can balance your own cash drawer" and gave her keys to him. She walked out with Schafer chasing her. She was crying when she left the building for the last time.

Over the next two months, Lisa suffered emotional distress. She was nervous, she could not sleep or eat and was distraught. By the time of trial, however, she felt "pretty normal." After leaving Community, Lisa did not work for a while but later went to a secretarial school, became employed and was still employed at time of trial.

On August 2, 1982, plaintiff filed a petition in Jefferson County—entitled "Intentional Tort" against Community Federal. This action was subsequently dismissed on January 17, 1984. In January, 1984, plaintiff filed a petition entitled "Intentional Tort" in the City of St. Louis. That petition alleged that defendant "willfully, maliciously and with the intent to do so inflict[ed] severe, continuing mental stress upon Plaintiff by conduct which was outrageous in the extreme." The conduct alleged was that defendant (a) interrogated plaintiff for excess periods, (b) accused plaintiff of theft, (c) threatened plaintiff that if she did not cooperate she would spend seven years in jail, (d) threatened an investigation by the FBI, (e) prepared a confession of theft for plaintiff and (f) entreated plaintiff by saying that because of her Mexican American background she and her family would be sensitive to accusations of theft.

Some months later, plaintiff amended her petition alleging the same facts but sought damages in two counts. Count I pleaded the theory of outrageous conduct and Count II pleaded the theory of prima facie tort. She sought actual damages in the amount of $450,000 and punitive damages in the sum of $450,000.

Trial was held in November, 1985. At trial, in addition to the above facts, MacNaughton testified that he undertook an investigation of the alleged missing money and stated that after the results of the polygraph came in, he attempted to "break" Lisa to get at the truth. He also said that after the polygraph test, in the second interview he was attempting to psychologically break her to confess.

During the trial, MacNaughton testified as follows:

Q. Now, during the second interview, ... you were attempting to psychologically break her to get her to confess; is that true?

A. Are you talking about the second interview?

Q. Yes, sir.

A. After the results of the polygraph?

Q. Yes, sir.

A. That's correct.

When questioned as to whether the purpose of every investigation is to "psychologically break suspects," MacNaughton answered, "No, to arrive at the truth through reasonable methods." He testified that he believed that Lisa was "involved" with the missing money. When asked about Lisa's reaction in the first interview, he indicated that Lisa was on the verge of tears—"tears tend to well up in the eyes. The reactions are somewhat uncoordinated, lip quivers, things like that." And when asked whether he had a lot of occasions where that's happened, his answer was "perhaps, twenty thousand times."

Dr. John T. Biggs, a psychiatrist testified, that although Lisa did not seek any medical treatment prior to filing the lawsuit, she was examined by him after filing this action. In his professional opinion,

Lisa suffered from a reactive depression induced by the stress of the two weeks. "It's a diagnostic, medical syndrome of depression," caused by the stress of the "whole events." Lisa's parents testified as to her emotional distress during the months following the March-April events.

Upon completion of the evidence, and after appellant moved for a directed verdict, the court instructed the jury. Plaintiff's verdict direction (No. 6) instructed on the theory of prima facie tort.[2]

The court also instructed on punitive damages. The instruction defined the term "malicious" as not "hostile, spite or ill will, as commonly understood, but means the doing of a wrongful act intentionally without just cause of excuse." [3]

After argument the jury returned a verdict in favor of plaintiff in the amount of $15,000 actual damages and $75,000 punitive damages. Judgment was entered thereon. After appellant's motions for judgment n.o.v. and new trial were overruled, defendant timely appealed.

### III

■ The dispositive issue in this appeal is whether the plaintiff made a submissible case on her pleaded and instructed theory of prima facie tort. This court must view the evidence and all reasonable inferences therefrom which is favorable to the verdict and the evidence submitted by the defendant is to be excluded except that which supports the verdict. *Dowd v. General Motors Acceptance Corp.*, 685 S.W.2d 868, 873 (Mo.App.1985); *Bayne v. Jenkins*, 593 S.W.2d 519 (Mo. banc 1980). The rule is, however, that every fact and element of the plaintiff's case must be submissible. *Gibson v. Newhouse*, 402 S.W.2d 324, 327 (Mo.1966).

Scholars disagree as to whether there exists in Anglo-American law a "unifying principle" of tort law, of which classifications are examples or whether there are distinct "forms of tort." [4] A general unifying principle of tort law was espoused by some decisions and legal scholars.[5] But as shown by judicial decisions and especially the MAI 3rd Instructions, Missouri, as does most states, views the law of torts as one of separate and independent theories. However, it is clear that modern legal thought considers that "there exists a residue of tort liability which has not been

2. Your verdict must be for Plaintiff, if you believe:
First, an employee of Defendant while acting within the scope and course of employment for Defendant sought to obtain a confession from the Plaintiff that she had stolen money from the Defendant, and
Second, Defendant's employee intended to cause injury to Plaintiff, and
Third, as a direct result thereof Plaintiff was injured, and
Fourth, there was no justification or an insufficient justification for the acts of Defendant's employee.
Acts were within the 'scope and course of employment' as that phrase is used in this instruction even though not specifically authorized by Community Federal Savings and Loan if:
1. They were done by the employee to further the interests of Community Federal Savings and Loan under the general authority and direction of Community Federal Savings and Loan, and
2. They naturally arose from the performance of the employee's work.

3. If you find in favor of Plaintiff under Instruction No. ___, and if you believe the conduct of Defendant as submitted in Instruction No. ___ was willful, wanton or malicious, then in addition to any damages to which you find Plaintiff entitled under Instruction No. ___ you may award Plaintiff an additional amount as punitive damages in such sum as you believe will serve to punish Defendant and to deter Defendant and others from like conduct.
The term "malicious" as used in this instruction does not mean hatred, spite or ill will, as commonly understood, but means the doing of a wrongful act intentionally without just cause or excuse.

4. See Forkosch, *An Analysis of the "Prima Facie Tort Cause of Action,"* 42 Cornell L.Q. 465 (1957) and discussion in Annot., 16 ALR3d 1191, 1195 (1967).

5. Lord Bowen's dictum in *Mogul Steamship Co. v. McGregor, Gow & Co.*, 23 Q.B.D. 598, 613 (1889), aff'd, 1982 A.C. 25 (H.L. has been called the "classic statement" of the prima facie tort doctrine. See Mr. Justice Holmes' Thesis in Holmes, *Privilege, Malice and Intent,* 8 Harv.L. Rev. 1, 3 (1894). See also the historical discussion by Judge Hogan in *Bandag of Springfield, Inc. v. Bandag, Inc.,* 662 S.W.2d 546, 551 (Mo. App.1983); Comment, Prima Facie Tort, 11 Cumb.L.Rev. 113 (1980); Annot., Prima Facie Tort, 16 ALR3d 1191, 1195–1196 (1967).

explicated in specific forms of tort action and which is available for the courts to develop as common law tort actions as the needs of society require such development." *Porter v. Crawford & Co.*, 611 S.W.2d 265, 268 (Mo.App.1981).[6] The Restatement (Second) of Torts § 870 (1979) supplies the guidelines for the imposition of liability under that theory.

Modern Missouri tort law now recognizes the tort theories of (1) intentional infliction of emotional distress, or as sometimes referred to as "outrageous conduct" under the principles of the Restatement (Second) of Torts, § 46 (1965) and *Pretsky v. Southwestern Bell Telephone Co.*, 396 S.W.2d 566 (Mo. banc 1965); *Smith v. Standard Oil, Div. of Amoco Oil Co.*, 567 S.W.2d 412 (Mo.App.1978) and *Rooney v. National Supermarkets, Inc.*, 668 S.W.2d 649 (Mo.App. 1984); (2) negligent infliction of emotional distress without physical contact, *Bass v. Nooney*, 646 S.W.2d 765 (Mo. banc 1983) and its progeny and (3) the doctrine of prima facie tort.

Although the doctrine of prima facie tort is encased in a "misty shroud," *Dake v. Tuell*, 687 S.W.2d 191, 192 (Mo. banc 1985), and our Supreme Court has never, to date, whole-heartedly and completely adopted the theory, Missouri has recognized it. Although *Porter, supra* is considered to be the seminal case, research shows that it was recognized much earlier in this state. *Bandag, supra* This history and analysis has been reviewed in *Bandag and Porter, supra.* Our Supreme Court has said "[n]o case resulting in a verdict for the plaintiff on a prima facie tort theory has been affirmed by the Missouri appellate courts",[7] *Brown v. Missouri Pacific R. Co.*, 720 S.W.2d 357, 361 (Mo. banc 1986), and this court has questioned its "viability" in *Costello v. Shelter Mut. Ins. Co.*, 697 S.W.2d 236, 237 (Mo.App.1985). The prima facie tort doctrine, however, is still nominally recognized.

■ The essential elements of the a prima facie tort are:

1. An intentional lawful act by the defendant;

2. An intent to cause injury to the plaintiff;

3. Injury to the Plaintiff; and

4. An absence of any justification or an insufficient justification for the defendant's act. *See Porter v. Crawford*, 611 S.W.2d at 268, *Dowd v. General Motors Acceptance Corp.*, 685 S.W.2d 868, 872 (Mo.App. 1984) and *Boyer v. Carondelet Sav. & Loan Ass'n*, 633 S.W.2d 98 (Mo.App.1982).

■ Since *Porter*, there have been a number of other refinements superimposed upon these elements. *Bandag* declared that where the plaintiff has a claim within a well-defined nominate tort, then such claim cannot be submitted under the prima facie tort theory. *See also Guirl v. Guirl*, 708 S.W.2d 239, 248 (Mo.App.1982). In *Lundberg v. Prudential Ins. Co.*, 661 S.W.2d 667 (Mo.App.1983), the court held that proof on the second element must be of an actual, specific intent to injure, and not merely an intent to do the act which may result in injury. In this regard, plaintiff has a heavy burden to shoulder. Furthermore, *Porter, Bandag* and *Lundberg* declare that the court must also apply a "balancing of interests" test which includes four elements—the nature and seriousness of the harm; the interests promoted by the actor's conduct; the character of the means used; and the motive of the actor. Restatement (Second) of Torts, § 870 (1979). *See Dowd*, 685 S.W.2d at 872–873, *supra; Rooney, supra*, 668 S.W.2d 649. In order to make a submissible case each and every element must be proved.

## IV

■ When all of these requisite elements and refinements are examined in the light

---

**6.** See Comments, *Prima Facie Tort Recognized in Missouri*, 47 Mo.L.Rev. 553 (1982); *The Prima Facie Tort Doctrine in Missouri*, 50 U.Mo. K.C. 128 (1986).

**7.** *Cf.* where court held that the doctrine of prima facie tort was applicable. *Tully v. Pate*, 372 F.Supp. 1064, 1071 (D.C.S.C.1973); *Macey v. New York State Electric & Gas Corp.*, 80 A.D.2d 669, 436 N.Y.S.2d 389 (1981); Annot., 16 ALR3d 1191 and 1986 Supp.

of the complete record in this case and the underlying social policies, we believe that the plaintiff did not make a submissible case on each and every element and should not be entitled to recover against the defendant.

First, there was no specific intent to injure Lisa or to destroy her. There was an intent on MacNaughton's part to do an act of investigating the loss, as a business practice, but not a specific intent to injure. The choice of words by MacNaughton at trial that it was his intent to "break" Lisa was a poor one and must be considered in the context of the facts. The word "break" was first used by the attorney for the plaintiff in questioning MacNaughton. The word "break" does not necessarily mean "crush" or "beat" a person, but also connotes a purpose "to demonstrate the falsity or lack of credibility" of a person. Webster's *Third New International Dictionary (Unabridged)* 1976. An audio examination of the tapes of the two interviews and a careful examination of the transcripts show that MacNaughton was informing Lisa of the possible seriousness of the incident, its ramifications for her future, and possible disgrace for the rest of her life.

An examination of the tapes also indicate MacNaughton questioned Lisa in a calm manner. There were no physical threats. The statements he made do not comport with the "heavy" burden of showing an intent to injure required under the prima facie tort doctrine. While Lisa was understandably upset, shaken, crying and suffered emotional distress for a period of some two months, she was not permanently injured emotionally, and within a reasonable period of time located a position which she has retained for some three years.

We cannot say that MacNaughton exceeded all bounds of propriety in his interrogation under recognized standards. See R.F. Royal & S.F. Schutt, *The Art of Interviewing and Interrogation, a Professional Manual* (1976); A.P. Bristow, *Field Interrogation* (1964); F.E. Inbau & J.E. Reid, *Interrogations and Confessions* (1967). Under the decisions discussed above, we hold that there was no specific, clear-cut, express, malicious intent to injure. An intent to injure is the test, not an intent to act which results in some injury. *Lundberg, supra,* 661 S.W.2d at 670.

Second, even if it can be said that "break" means an intent to injure, the other elements are not sufficiently proved to make a submissible case. There was sufficient justification for the acts of the defendant. A sum of money was missing, which if stolen was sufficient to constitute a felony. The appellant is a savings and loan institution closely monitored by federal and state law; it would be remiss in its duties if it did not take action to pursue the quest for the missing money. In such circumstances, some latitude and free reign is essential to such an institution. As developed in the decisions dealing with prima facie tort, the rules as to justification are "essentially another way of stating that the acts must have been done out of 'disinterested malevolence.'" 16 ALR3d, *supra* at 1221. MacNaughton was not a disinterested malevolent person bent on mischief.

This case is akin to *Rooney, supra,* 668 S.W.2d 649, decided by this court. We held that where an employee was berated and suffered mental pain, embarrassment and emotional distress, the plaintiff was not entitled to recover and summary judgment for defendant was granted. We quoted a portion of the Restatement (Second) and said in effect that the rough edges of our society are still in need of a good deal of filing down, but in the meantime a plaintiff must necessarily be expected to be hardened to occasional acts which are definitely inconsiderate and unkind.

Third, plaintiff had available a nominate tort. Missouri recognizes the nominate tort of intentional infliction of emotional distress as outlined in the Restatement (Second) of Torts, Section 96, and *Pretsky v. Southwestern Bell Telephone Co.,* 396 S.W.2d 566 (Mo.1965) and its progeny. The availability of a nominate tort does not mean that the plaintiff may be successful and actually recover damages under that theory, but means that the pri-

ma facie tort doctrine cannot be utilized when such a tort is available.

Fourth, when the "balancing of interests" tests outlined in the Restatement are examined carefully, we are compelled to conclude that the balance is weighted in favor of the defendant, rather than the plaintiff in this cause. Under this test, there are four factors: (1) the nature and seriousness of the harm to the injured party; (2) the interests promoted by the actor's conduct; (3) the character of the means used by the actor; and (4) the actor's motive. With reference to factor (1) physical harm is weighted more heavily than emotional harm; with reference to factor (2) established privilege or rights are to be afforded proper weight; with reference to factor (3) conduct which offends our societal concepts of fairness and morality favor liability; and with reference to factor (4) the degree of malice motivating the actor may be so overwhelming so as to tip the scales. *Lundberg, supra,* 661 S.W.2d at 671.

In utilizing this "balancing test" the plaintiff did not make a submissible case. Emotional distress is the basis of the plaintiff's claim; the interests of defendant's institution must be weighted against the short duration of the emotional distress of the plaintiff; the acts of the defendant do not rise to the level of offending or shocking society's sense of fairness, and the conduct of the defendant's agent does not show that "heavy burden" of malice. The malice required equates to "spite or ill will." *Dowd, supra,* 685 S.W.2d at 875.

Therefore, under all these tests and principles of prima facie tort, and adhering to the requisites laid down in the judicial decisions which have been decided heretofore, we believe that the plaintiff did not make a submissible case under the prima facie tort theory so that the judgment should be reversed.

We conclude, therefore, that (1) there was no submissible case made on each and every element of the prima facie tort doctrine as required by the judicial decisions heretofore rendered in this state, (2) plaintiff had available a nominate tort and (3)

the "balance of interests" weighted in favor of defendant.

## V

Because of the disposition we make, it is not necessary to examine in detail the other points raised by the appellant. Suffice it to say that whether the injury suffered by the plaintiff is compensable under the workers' compensation law under recent decisions is not clear. See *Wolfgeher v. Wagner Cartage Service, Inc.,* 646 S.W.2d 781 (Mo. banc 1983); *Wynn v. Navajo Freight Lines, Inc.,* 654 S.W.2d 87 (Mo. banc 1983); *Houston v. Aetna Cas. & Sur. Co.,* 701 S.W.2d 207 (Mo.App.1985); *Hood v. Trans World Airlines, Inc.,* 648 S.W.2d 167 (Mo.App. 1983); *Hollrah v. Freidrich,* 634 S.W.2d 221 (Mo.App.1982); *Pryor v. United States Gypsum Co.,* 585 F.Supp. 311 (W.D.Mo. 1984); *McCoy v. Liberty Foundry Co.,* 635 S.W.2d 60, 62 (Mo.App.1982). It may well be that such injuries fall within the ambit of that law. Section 287.120, R.S.Mo.1986 2A A. Larson, *Workmen's Compensation Law,* ch. XIII (1986); Todd v. Goostree, 493 S.W.2d 411 (Mo.App.1973). Annot., 46 ALR3d 1279; 96 ALR3d 1064 (1979)—willful conduct; § 287.440 R.S.Mo.1986; *Wedemeier v. St. Louis Malleable Casting Co.,* 52 S.W.2d 569 (Mo.App.1932).

Neither is it crystal clear under the present decisions of the Supreme Court as to whether MAI3d 16.01 is the proper instruction to be given in a case of this kind. See *Sanders v. Daniel Intern Corp.,* 682 S.W.2d 803 (Mo. banc 1984); *Proctor v. Stevens Employment Service, Inc.,* 712 S.W.2d 684 (Mo. banc 1986); *DeLong v. Osage Valley Elec. Co-op. Ass'n,* 716 S.W.2d 320 (Mo.App.1986); *Crabb v. Mid-American Dairymen, Inc.,* No. 14362, Southern District, Oct. 29, 1986. In the posture of our disposition, we need not decide this issue at this time.

None of the decisions relied upon by the respondent definitely supports her position that she is entitled to recover under the prima facie tort theory. She relies upon *Franklin v. Mercantile Trust Co., N.A.,* 650 S.W.2d 644 (Mo.App.1983).

*Franklin* states that plaintiff need not assign a tort a name so long as the allegations of the petition state a claim under the principles of substantive law. But that statement is made with reference to the pleadings. A plaintiff must still instruct and submit a particular theory.

## VI

Having examined the entire record, the judicial authorities relied upon by the parties and other decisions and authorities, we conclude that the judgment should be reversed.

The judgment is reversed.

SNYDER, C.J., and CARL GAERTNER, J., concur.