Mabel N. KILLION, Mike E. Killion, Mika J. Killion, Richard Killion, Tresa Killion, Bill J. Killion & Mitzi Killion, Respondents,

v.

BANK MIDWEST, N.A. and Dickinson Financial Corporation and John Crist, Appellants.

No. WD 53455.

Missouri Court of Appeals, Western District.

Dec. 15, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied Feb. 2, 1999.

Application to Transfer Denied April 27, 1999.

R. Lawrence Ward, Philip W. Bledsoe, Shughart Thomson & Kilroy, Kansas City, Donald G. Stouffer, Marshall, for appellants.

Mark T. Kempton, J. Christopher Spangler, Wesner, Kempton, Russell and Dominique, Sedalia, for respondents.

Before HOWARD, P.J.,
BRECKENRIDGE and HANNA, JJ.

BRECKENRIDGE, J.

Bank Midwest, N.A., formerly known as Community Bank (the Bank), and Dickinson Financial Corporation (Dickinson) appeal the trial court's judgment against them and in favor of Mabel Killion, Mike E. Killion, Mika J. Killion, Richard Killion, Tresa Killion, Bill J. Killion, and Mitzi Killion (the Killions) for $55,000 in compensatory damages and $500,000 in punitive damages on the Killions' prima facie tort claim. On appeal, the Bank and Dickinson claim the Killions did not make a submissible case of prima facie tort. The Bank and Dickinson also contend that the trial court erred in overruling their objections to (1) the Killions' reading to the jury allegedly inflammatory and prejudicial remarks made by a judge in a prior proceeding between the parties; and (2) the Killions' arguing to the jury that it could draw improper conclusions from the failure of the Bank and Dickinson to call Paul Shepherd, former legal counsel for the appellants, to testify. Additionally, the Bank and Dickinson argue that the trial court should not have submitted the Killions' claim for punitive damages to the jury because the Killions did not make a submissible claim for punitive damages, and the punitive damage instruction did not require proof by clear and convincing evidence. Because the Killions failed to make a submissible case of prima facie tort, the judgment of the trial court is reversed.

### Factual and Procedural Background

This court is to review the evidence in the light most favorable to the plaintiffs' case, and disregard all contrary evidence. *Gary Surdyke Yamaha, Inc. v. Donelson,* 743 S.W.2d 522, 523 (Mo.App.1987). In that light, the evidence is that the Killions owned and operated a 643–acre farm in Pettis County. Noah, who died in August, 1995, and his wife Mabel lived in a house on the farm. The remaining respondents are the sons and daughters-in-law of Noah and Mabel.

In 1988, the Killions had three mortgages on the farm which totalled $435,000.00. Two of the mortgages were from the Federal Land Bank, and one was a purchase money mortgage for 250 acres from the seller, a Mr. Bales. The Killions were in default on the Federal Land Bank mortgages, so Noah went to Don Brown, interim president of the Bank, to inquire about refinancing the loans. Noah had a long-standing relationship with the Bank, and had served for 17 years as an advisory director on its board of directors. Noah's role as an advisory director was to solicit bank business and attend monthly meetings to review loans in default and vote on extensions of credit. On June 8, 1988, the Killions executed a promissory note payable to the Bank in the amount of $345,000.00 (the "land note"). The note paid off the loans from the Federal Land Bank. The Killions also executed a separate note in the amount of $125,827.63 (the "equipment note"). Both notes were secured by a deed of trust on the

Killions' 643 acres of real property in Pettis County, and a first security interest in all growing crops, government payments or lease payments received for the land, all machinery and equipment, and all money, securities, and other property held by the Killions at the time the notes were executed and in the future. Both loans were serviced by Dickinson Financial Corporation, the sole owner and stockholder of the Bank.

The promissory notes and the deeds of trust were drafted by Paul Shepherd, legal counsel for the Bank and Dickinson. Under the terms of the land note, the Killions were to make one payment of $42,000.00 each year, and a balloon payment of the remaining principal and any accrued but unpaid interest at the end of six years. One of the conditions of default on the land note was the failure of the Killions to sell the farm within ten years after the note's execution. The land note also contained a contingent interest clause, which provided that upon the sale of the farm, the Killions would owe additional interest. The additional interest would be the lesser of $90,000.00 or 40% of the amount by which the gross sales price of the farm exceeded the outstanding principal balance of the loan on the date of sale if the farm was sold prior to the maturity date, or the outstanding principal balance due on the maturity date if it was sold after the maturity date. The land note also granted the holder of the note the right of first refusal to purchase the farm and, in the deed of trust, the Killions waived their equity of redemption. Thus, pursuant to the deed and note, the Killions had to sell the farm within ten years after signing the note, regardless of whether they had paid all of the principal and interest due, the Bank had the right to buy it at a price discounted by the contingent interest amount, and the Killions could not exercise the right of redemption to buy back their farm.

The Killions timely made the first payments on the notes, which were due December 31, 1988. However, the Killions were late in making their payments for the next three years. The Bank allowed the Killions to pay late, but charged them interest which was 3.0 percentage points higher during the periods they were late, as allowed by the terms of the notes. When the Killions were not able to timely pay their 1991 payment, the Bank extended another loan to the Killions to cover the Killions' interest payment for 1991 and their crop input cost. The Killions repaid that loan at an eleven percent interest rate.

By the fall of 1991, the Killions decided they would need to sell some of their land and equipment because they were having difficulty making their loan payments. The Killions had discussions with John Crist, the loan officer at Dickinson assigned to service their loan. They told Mr. Crist that they wanted to partially liquidate their property and modify the terms of the land note to reduce the annual payment amount so that they would be able to service the note. In February of 1992, the Killions held an auction and sold 250 acres of their land and most of the farm equipment. The Killions gave the Bank the proceeds from the sale, which were significantly more than the deficiency in their 1991 payment. The Bank reduced the principal balance on the land note to approximately $171,500.00 and the principal balance on the equipment note to $25,000.00. The Bank also applied $35,129.09 of the proceeds toward the payment of contingent interest. The remaining real property and equipment securing the notes was valued at $356,000.00.

Mr. Crist testified that he knew there was no authority under the land note to collect contingent interest from the Killions without a sale of the entire property or the note maturing, and that there was no authority under the note to compute a contingent interest amount of $35,129.09 at that time. He testified that his authority for collecting contingent interest at that time and in that amount came from the modification agreement the Bank had proposed to the Killions.

When they learned that the Bank had applied a portion of the sale proceeds to the payment of contingent interest, the Killions consulted an attorney, Adam Fischer, because the promissory note provided for payment of contingent interest only "[u]pon the sale of *all* the real property which secures this note." (Emphasis added). The Killions also asked Mr. Fischer to review the Bank's

proposed modification agreement. Mr. Fischer advised the Killions not to sign the modification agreement, as it contained an exculpatory clause on usurious or illegal interest, disclaimed a fiduciary relationship between the Killions and the Bank, and provided that the Killions released the Bank from liability for any claims the Killions might have had against it. Mr. Fischer also advised the Killions not to make any further payments on the land note because he was concerned that the Bank would apply more payments toward contingent interest, and the contingent interest on this note was owed on the difference between the principal balance on the note and the sale price of the property. Every time the Killions made a payment reducing the principal balance, they were actually increasing the amount of contingent interest due. During this time, the Killions began negotiating with Chemical Bank of Sweet Springs to refinance the loan; however, Chemical Bank would not commit to the refinancing until it was determined whether the Killions owed $90,000.00 in contingent interest.

Mr. Fischer wrote a letter to the Bank, dated October 23, 1992, advising it that the Killions would not sign the modification agreement. He told the Bank that he believed the contingent interest provision was not enforceable because the Bank had misrepresented to the Killions when they signed the note how the contingent interest would be calculated, and that the terms of the note did not entitle the Bank to collect contingent interest upon the sale of only part, but not all, of the real estate. He also told the Bank that the exculpatory language in the modification agreement was not acceptable to the Killions. Mr. Fischer testified that he had served as in-house counsel for two banks for a total of twenty-eight years, and had reviewed note modification agreements. In his experience, the exculpatory clause on illegal interest in the note modification agreement was unusual, and he had never seen a disclaimer of a fiduciary relationship between a bank and a borrower or a release of all the lender's liability in a note modification agreement. Mr. Fischer asked the Bank to prepare a payoff quote so that the Killions could

end their relationship with the Bank and Dickinson.

Upon receipt of the October 23, 1993 letter from Mr. Fischer informing him that the Killions would not sign the modification agreement and that Mr. Fischer believed the contingent interest provision was not enforceable, Mr. Crist recommended foreclosing on the Killions' property. Mr. Crist responded to Mr. Fischer's letter by sending a letter dated November 12, 1992 to the Killions, in which he referred to the fact that the Killions would not execute the proposed modification, and then demanded that they make the scheduled payment on December 31, 1992. Mr. Crist also provided a payoff quote, in which he applied the $35,129.09 he had previously collected as contingent interest toward principal reduction. However, the payoff quote also included a demand for $90,000.00 of contingent interest. He told the Killions that the letter would be the only demand letter they would receive prior to foreclosure.

The Killions' attorney sent another letter to Mr. Crist on December 17, 1992. He again advised that he did not believe the contingent interest provision was enforceable, but that the Killions would pay the Bank $15,000.00 to settle the contingent interest issue, and pay all of the unpaid principal balance on both notes plus the annual interest accrued.

On January 12, 1993, an attorney for Dickinson notified the Killions that a foreclosure sale of the Killions' property would be held on February 9, 1993. The Notice of Foreclosure was published in the *Sedalia Democrat* newspaper. The Killions testified that people in the community who saw the foreclosure notice in the paper made comments that embarrassed and humiliated them. They also testified that the threatened foreclosure was stressful on their marriages, and was particularly stressful on Noah and Mabel Killion, because they worried about losing their home.

On February 4, 1993, the Killions filed a petition in the Circuit Court of Pettis County against the Bank and Mr. Crist, as successor trustee under the deed of trust, seeking a temporary restraining order and preliminary

injunction prohibiting the foreclosure sale, and a declaratory judgment that the contingent interest provision of the land note was invalid and unenforceable, or, in the alternative, that contingent interest was not owed at that time because there had been no sale of all of the property. The court entered the temporary restraining order prohibiting the foreclosure sale. On February 11, 1993, the court held a hearing on the Killions' petition for a preliminary injunction. Noah Killion, Mike Killion, Mr. Crist, and their respective counsel appeared at this hearing. At the hearing, the Killions testified that they were afraid they would lose their equity in the farm if the foreclosure sale took place, and they had sought refinancing from Chemical Bank, but Chemical Bank would not commit until the contingent interest issue was settled. The Killions' attorney asked the court to take judicial notice of 4 C.S.R. 140–6.050. This regulation provides, in pertinent part, as follows:

> PURPOSE: The legal separation of deposit taking from investment banking prevents banks from investing in the stock of other corporations. It has also raised a question whether banks can contract to receive additional interest or stock purchase warrants from a borrower contingent upon the success of the borrower's business. This rule authorizes contract provisions to receive additional interest or stock purchase warrants from the borrower contingent upon the success of the borrower's business. Further, it permits a new business to negotiate a loan agreement with a commercial bank which may substantially reduce interest expense in the early years until a date when the business is more established.
>
> (1) A bank may contract to receive additional interest on any loan for business purposes contingent only upon the profitability and successful operation of the business receiving the proceeds of the loan. In no event shall the repayment of principal be subject to any contingency.

The Killions' attorney argued that this regulation made the contingent interest provision of the note unenforceable because the contingent interest was not based on profitability and successful operation of the Killions' business. The Bank argued that § 408.035, RSMo Cum.Supp.1992, applied. Section 408.035 provided that "it is lawful for parties to agree in writing to any rate of interest, fees, and other terms and conditions in connection" with a loan to a corporation, business loan over $5,000, real estate loan other than residential real estate loans, and certain other loans. The Bank also argued that the case should be dismissed due to improper venue. The court took the matter under advisement and, prior to the court ruling, the Killions voluntarily dismissed their petition against the Bank on February 17, 1993.[1]

In a letter dated February 24, 1993, the attorney for Dickinson notified the Killions of another foreclosure sale on their farm set for March 23, 1993.[2] A Notice of Foreclosure was again published in the newspaper. On March 2, 1993, the Killions filed another petition in Pettis County against the Bank for declaratory judgment asking the court to declare the contingent interest provision of the note invalid and unenforceable, or, in the alternative, that no contingent interest was owed at that time. On March 22, 1993, the Killions also filed an additional petition in Pettis County against Mr. Crist for a temporary restraining order and preliminary injunction prohibiting the foreclosure sale. The court granted the temporary restraining order, which was served on March 23rd, immediately before the sale started. After being served with the temporary restraining order, the attorney for Dickinson told the

---

1. Mr. Crist was never served with the February 4, 1993 petition. However, he did appear specially at the February 11, 1993 hearing to contest venue. The Killions dismissed the February 4, 1993 petition against Mr. Crist on May 25, 1993.

2. Mr. Crist was not the original trustee under the deed of trust as executed on June 8, 1988. Although he was not appointed the successor trustee until January 14, 1993, the foreclosure notice sent to the Killions on January 12, 1993, stated that he was the "successor trustee." On the second foreclosure, Mr. Crist was removed as successor trustee on February 25, 1993, one day after the foreclosure notice was sent to the Killions. The evidence shows that he in fact acted as trustee in instituting both foreclosures, which was the source of the Killions' damages.

crowd at the foreclosure sale that the sale was off for that day, but "[t]here will be a sale. This farm will sell."

On May 12, 1993, Judge Donald Barnes granted the Killions' petition against Mr. Crist for a preliminary injunction against the foreclosure proceedings. In his order, Judge Barnes made the following comments about the Bank:

> In short, the Bank has ahold of [the Killions] by the short hair and refuses to let loose even upon payment in full.

> * * *

> It would appear there may be some circumstances, however, where [the Killions] may mount a reasonable challenge to the validity or enforceability of what seems to this Court on first review arguably a very harsh and onerous, perhaps under the facts, an egregiously unfair contract which was drawn by the Bank represented by counsel and entered into by [the Killions], unexperienced in such non-traditional transactions and apparently unrepresented by counsel.

The Killions' declaratory judgment action against the Bank, seeking a holding that the contingent interest provision was unlawful and also seeking damages, was transferred to Saline County after the Bank had requested a change of venue. The court granted the Bank's motion to appoint a receiver to collect all of the income from the farm pending the resolution of the contingent interest dispute. The trial court found that the contingent interest provision was invalid and unenforceable because it violated 4 C.S.R. 140–6.050. This court affirmed that decision in *Killion v. Bank Midwest, N.A.,* 886 S.W.2d 29, 33–34 (Mo.App.1994).

Upon receiving the appellate decision, the Killions informed Chemical Bank that they did not owe contingent interest. Chemical Bank indicated they were willing to refinance the loan if the Bank would release its deed of trust. The Bank refused to release the deed of trust on the property to allow the refinanc-

ing because the attorney for Dickinson claimed the Killions owed $29,000.00 in attorney fees incurred by a Kansas City law firm [3] Dickinson had hired to prepare the application to transfer *Killion v. Bank Midwest,* 886 S.W.2d 29, to the Missouri Supreme Court. The trial court held a hearing in December of 1994, and recommended that the Bank release its deed of trust, conditioned upon the receiver retaining the $40,000.00 the receiver had collected in farm income, until the attorney fee issue was decided. The Bank and Dickinson refused to agree, so the court entered an order effectuating its recommendation. A representative of Chemical Bank attended the hearing, and had a blank check ready to pay off the Killions' note; however, the attorney for Dickinson refused to accept it, claiming that Chemical Bank's check was not "good and available funds." The Bank and Dickinson required Chemical Bank to wire transfer the payoff funds to them. The court later ruled that the Killions did not owe the Bank and Dickinson attorney fees, as the Killions were the prevailing party in the declaratory judgment action.

■ The Killions filed the present action for damages against the Bank, Dickinson, and John Crist, alleging that the Bank made fraudulent misrepresentations to the Killions at the time the Killions executed the note, Mr. Crist breached his fiduciary duty to the Killions as trustee under the deed of trust, Dickinson breached its fiduciary duty to the Killions because Mr. Crist was acting as an employee of Dickinson, the Bank breached its duty of good faith to the Killions by allowing Dickinson to proceed with the foreclosure sales, and the Bank, Dickinson and Mr. Crist committed a prima facie tort by proceeding with the foreclosure sales without justification. The case was tried to a jury. At the close of the evidence, the trial court directed a verdict in favor of the Bank, Dickinson and Mr. Crist on all counts except for the prima facie tort claim. On the Killions' prima facie tort claim, the jury found in favor of the Killions and against the Bank and Dickinson, and awarded the Killions $55,000

---

3. The law firm hired to prepare the transfer was not the law firm representing the Bank and Dick- inson on this appeal.

in compensatory damages. The jury also awarded the Killions $100,000 in punitive damages from the Bank, and $400,000 in punitive damages from Dickinson.[4] The Bank and Dickinson timely filed this appeal. The Killions did not appeal the directed verdicts against them.

## The Killions Failed to Make a Submissible Case of Prima Facie Tort

■ The Bank and Dickinson's first point is that the Killions failed to make a submissible case of prima facie tort. Submissibility is a question of law. *Gary Surdyke Yamaha*, 743 S.W.2d at 523. In reviewing the submissibility of a plaintiff's case, this court views the evidence in the light most favorable to the plaintiff's case, presuming the plaintiff's evidence to be true, and giving the plaintiff "the benefit of all reasonable and favorable inferences drawn from the evidence." *Riley v. Riley*, 847 S.W.2d 86, 88 (Mo.App.1992). To make a submissible case of prima facie tort, the Killions need to satisfy two requirements. First they need to demonstrate that they have substantial evidence on each of the four elements of their prima facie cause of action: (1) an intentional lawful act by the Bank and Dickinson; (2) the Bank's and Dickinson's intent to injure the Killions; (3) injury to the Killions; and (4) an absence of justification or insufficient justification for the Bank's and Dickinson's act. *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 315 (Mo. banc 1993).

■ In addition to the requirement that the Killions have substantial evidence on each element of their prima facie tort claim, there is a further prerequisite before the Killions can be found to have made a submissible case. *Lundberg v. Prudential Ins. Co. of America*, 661 S.W.2d 667, 670 (Mo.App. 1983). The Bank's and Dickinson's conduct must be found to be tortious under a "balancing of interests" test before they can be held liable. *Id.* Not every intentionally-caused harm merits a tort remedy. RESTATEMENT (SECOND) OF TORTS § 870 cmt. e (1977). Un-

der the balancing of interests test, the court must weigh the conflicting interests of the parties to the litigation in light of the social and economic interests of society. RESTATEMENT (SECOND) OF TORTS § 870 cmts. c,d,e. Essentially, the court balances "the bad motivation of the defendant against the claimed justification for the act." *Porter v. Crawford & Co.*, 611 S.W.2d 265, 270 (Mo.App.1980). To do this, the court considers four factors: "(1) the nature and seriousness of the harm to the injured party; (2) the interests promoted by the actor's conduct; (3) the character of the means used by the actor; and (4) the actor's motive." *Lundberg*, 661 S.W.2d at 671.

Because this issue is dispositive, the court undertakes the analysis of the balancing of interests test to determine whether the Bank's and Dickinson's conduct is tortious. With regard to the first factor, an injury is defined as "the invasion of a legally protected interest." *Porter*, 611 S.W.2d at 271. The comments to the Restatement (Second) of Torts set forth a hierarchy of the harms entitled to protection under the law. Physical harm to the person and to property weigh most heavily. RESTATEMENT (SECOND) OF TORTS § 870 cmt. f. Harm to existing advantageous relationships weighs less heavily, and harm to prospective pecuniary interests weighs less heavily still. *Id.* The significance of emotional harm in the balancing of interests process "varies considerably depending largely upon its severity." *Id.* The severity of the harm suffered is an important consideration in every case, "and a serious harm to an interest less deserving of protection may be a more important factor in finding liability than a slighter harm to a more significant interest." *Id.*

■ The Killions presented evidence of both pecuniary injury and emotional harm as a result of the Bank and Dickinson instituting foreclosure proceedings. The Killions' claimed pecuniary injury was in the form of attorney fees and expenses which they incurred from the time the foreclosure sales were halted until the Bank released the deed

---

**4.** The Killions did not submit a verdict form pertaining to Mr. Crist; therefore, this court will consider their prima facie tort claim against Mr.

Crist abandoned. *Murray v. Ray*, 862 S.W.2d 931, 932 n. 1 (Mo.App.1993).

of trust. There was evidence that they incurred attorney fees in connection with obtaining the temporary restraining orders halting both foreclosure sales, and attorney fees and expenses in connection with obtaining a judicial declaration that the contingent interest provision of the note was invalid and unenforceable.

■ Generally, Missouri does not allow recovery of attorney fees and other litigation expenses in damage actions. *Ashworth v. Schneider,* 667 S.W.2d 16, 17 (Mo.App.1984); *Powell v. City of Osceola,* 636 S.W.2d 163, 164 (Mo.App.1982). There are exceptions to this rule. Attorney fees may be recovered when provided for by statute or contract, when incurred because of involvement in collateral litigation, or "when needed to balance benefits in a court of equity." *Carlund Corp. v. Crown Center Redevelop.,* 910 S.W.2d 273, 277 (Mo.App.1995). In this case, no statute or contract allows the Killions to collect attorney fees. To meet the collateral litigation exception, there must be a showing that the attorney fees were incurred in other litigation against a third party which is actually collateral to litigation involving the parties, such as when a party's breach of contract causes another party to the contract to sue or be sued by an outside third party. *Smith v. Chatfield,* 797 S.W.2d 508, 510 (Mo.App. 1990); *Carlund Corp.,* 910 S.W.2d at 277. This exception does not apply to the Killions, as they are asking for attorney fees and expenses incurred in previous litigation against the Bank and Dickinson, not against a third party.

■ Likewise, the Killions cannot recover attorney fees under the balance of benefits exception either, as that exception applies only in equitable proceedings in "those rare situations in which a party's pursuit of litigation enures to the benefit of other parties...." *Consol. Public Water Supply v. Kreuter,* 929 S.W.2d 314, 317 (Mo.App.1996). The Killions do not meet any of the exceptions allowing recovery of the attorney fees and expenses incurred in their prior litigation with the Bank and Dickinson. Therefore, the Killions' incursion of attorney fees and expenses due to the Bank's and Dickinson's instituting foreclosure proceedings against

them is not an invasion of a legally protected interest, and cannot constitute a compensable injury.

■ In addition to incurring attorney fees, the Killions also claimed that they suffered emotional injury from the institution of foreclosure proceedings. Emotional harm qualifies as a harm to a "legally protected interest" which can support a prima facie tort cause of action but, as previously noted, "[t]he significance of the emotional harm varies considerably depending largely upon its severity." RESTATEMENT (SECOND) OF TORTS § 870 cmt. f.

■ The evidence of emotional harm was provided by Noah and Mabel Killion's sons, Michael, Bill and Richard. Michael Killion testified that people in the community indicated to him that they had seen the notice of foreclosure in the paper, and that it was very bothersome to him. He testified that he heard "things from the neighbors," and that caused stress on him and his parents. He also testified that the impending foreclosure sale was embarrassing and humiliating to him. Bill Killion testified that the threatened foreclosure was very stressful on his marital relationship. Richard Killion testified that he heard comments from other persons in the community after the notice of foreclosure was published, and that those comments made him feel very embarrassed, ashamed, and humiliated. He also testified that it had a negative effect on his relationship with his wife, that it was hard to face people in the community on a day-to-day basis, and that he was "a little bit concerned" about the effect it would have on his business credit. Like his brother Michael, Richard also testified that the impending foreclosure was hard on his parents, and it was hard for him to watch his parents being humiliated.

This evidence proves that the Killions were stressed, humiliated and embarrassed by the actions of the Bank and Dickinson. Nevertheless, their emotional harm was not serious or severe under the hierarchy of harms of the Restatement; the Killions have a slight harm to the interest least deserving of protection. RESTATEMENT (SECOND) OF TORTS § 870 cmt. f. Under similar facts, factor one

in other cases has been weighted for the defendant. In *Lundberg*, 661 S.W.2d at 670, the plaintiff claimed that "his demotion would cause him to suffer loss of income and retirement benefits thereafter and that he was humiliated, disgraced and embarrassed." Because his claim was only emotional harm and harm to prospective pecuniary interests, factor one was weighted in favor of defendant. *Id.* at 671. Plaintiff's emotional harm of being nervous, unable to sleep or eat and being distraught for two months weighed in favor of defendant in *Kiphart v. Community Fed. Sav. & Loan Ass'n*, 729 S.W.2d 510, 518 (Mo.App.1987), considering the short duration of the emotional harm. Likewise, the appellate court in *Riley*, 847 S.W.2d at 89, found factor one weighted against a party who did not claim physical injury, but only emotional distress of short duration, noting that the evidence of emotional injury came only from the party and was not substantiated by medical testimony. Considering the nature of the Killions' injury, the first factor is weighted in favor of the Bank and Dickinson.

On the second factor, the nature and significance of the interests promoted by the actor's conduct, the court is to afford established privileges or rights of the actor proper weight. *Id.* In this case, the note and deed of trust gave the Bank and Dickinson the right to proceed with foreclosure in the event of the Killions' default, and the Killions were admittedly in default. Missouri law provides that foreclosure is proper and legal following default and the law requires publication of notice of the foreclosure, which is the sole basis of the Killions' claim of emotional damages. Sections 443.290, 443.320, RSMo 1994.

Nevertheless, the evidence showed that the Killions' default on the note was caused by the Killions' inability to refinance their debt to the Bank because the Bank and Dickinson insisted that the Killions pay contingent interest under an illegal provision in the note before the Bank would release the deed of trust on the Killions' farm. The Bank and Dickinson contend that they had every right to believe the contingent interest provision of the note was enforceable, and were justified in attempting to enforce it until this court determined it was illegal.

■ The Bank was entitled to contract for contingent interest, but its method of computing the contingent interest was found to be invalid in *Killion*, 886 S.W.2d at 33–34, because it was not contingent upon the success of the Killions' business as required by 4 C.S.R. 140–6.050. If this were the only problem with the method of calculating contingent interest, the Bank and Dickinson would have been more justified in enforcing the interest provision until it was ruled invalid. The method of computing contingent interest was also invalid, however, because it was unconscionable.[5]

■ A contract is substantively unconscionable if there is undue harshness in the terms of the contract. *World Enterprises, Inc. v. Midcoast Aviation*, 713 S.W.2d 606, 611 (Mo.App.1986). Or, as more colorfully stated, "an unconscionable contract is one, 'such as no man in his senses and not under delusion would make, on the one hand, and as no honest and fair man would accept on the other, ...'" *Liberty Fin. Mgmt. v. Beneficial Data*, 670 S.W.2d 40, 49 (Mo.App. 1984) (quoting *Hume v. United States*, 132 U.S. 406, 415, 10 S.Ct. 134, 137, 33 L.Ed. 393, 397 (1889)). Under the contingent interest provision of the Bank's loan to the Killions, the Bank was allowed to collect the lesser of $90,000.00 or the difference between the sales price and the outstanding principal balance of the note on the date of sale. Thus, every time the Killions made a principal payment, they were increasing their contingent interest liability. The note further required the Killions to sell their farm within ten years even if the note had previously been paid in full, and the Bank had the right to buy the property at a price discounted by the

---

5. "A promissory note is a written contract for the payment of money." *Merz v. First Nat. Bank of Franklin County*, 682 S.W.2d 500, 501 (Mo.App. 1984). *See also Sabine v. Leonard*, 322 S.W.2d 831, 837–38 (Mo. banc 1959). An unconscionable provision of a contract is unenforceable. *See Liberty Fin. Mgmt. v. Beneficial Data*, 670 S.W.2d 40, 49–50 (Mo.App.1984); *Waters v. Min Ltd.*, 412 Mass. 64, 587 N.E.2d 231, 232–34 (Mass. 1992); *Resource Management Co. v. Weston Ranch*, 706 P.2d 1028 (Utah 1985); Restatement (Second) of Contracts § 208 (1981).

contingent interest amount, while the note precluded the Killions from exercising their right of redemption. The terms contingent interest provision were unduly harsh and, therefore, are unconscionable.

There was also evidence from which the jury could find that the Bank and Dickinson were aware of the potential invalidity of the contingent interest provision and its questionable enforceability because Mr. Crist, the Bank's agent and Dickinson's employee, tried to get the Killions to sign the proposed note modification agreement. The proposed modification agreement contained an exculpatory clause on usurious or illegal interest in favor of the Bank, and provided that the Killions released the Bank of liability for any claims they might have had against it. The reasonable inference is that the Bank and Dickinson had knowledge of the invalidity of the contingent interest provision. This factor weighs in favor of the Killions.

On factor three, the character of the means used by the actor, we consider whether there is "conduct which offends our societal concepts of fairness and morality favor liability." *Riley*, 847 S.W.2d at 89. The legal character of the conduct is also to be considered. RESTATEMENT (SECOND) OF TORTS § 870 cmt. h. The means used by the Bank and Dickinson, the institution of foreclosure proceedings and the publishing of the notices of foreclosure, were not shocking or immoral in light of the fact that the note and deed of trust gave them the right to foreclose in the event of default. *See Boatmen's Bank of Butler v. Berwald*, 752 S.W.2d 829, 833 (Mo.App.1988); *Centerre Bank of Kansas City v. Distributors*, 705 S.W.2d 42, 54 (Mo. App.1985).

In fact, the Missouri Supreme Court has determined that there is no tort cause of action in Missouri for attempted wrongful foreclosure. *Reese v. First Mo. Bank & Trust Co.*, 736 S.W.2d 371, 373 (Mo. banc 1987). In so holding, the Court stated:

In our view, our authorizing a cause of action for wrongful attempted foreclosure would effectively nullify the purposes for having the expeditious non-judicial foreclosure of deeds of trust. If further provisions for delaying foreclosure of security instruments is to be made, we believe the legislature should make the decision. Our conclusion is compatible with the holdings of the large majority of the states recognizing nonjudicial foreclosure.

*Id.* These same concerns are applicable to permitting recovery under a prima facie tort cause of action based upon allegations that a lending institution intentionally harmed a debtor by wrongfully attempting to foreclose. There is the potential that a lender would hesitate to utilize non-judicial foreclosure of a deed of trust anytime a borrower challenged the validity of the underlying debt, because the lender would be fearful that it could be found liable for actual and punitive damages if the borrower's challenge was successful and the borrower could prove that the lender was motivated, in any part, by malice. The factor considering the character of the means used by the actor weighs in favor of the Bank and Dickinson.

With regard to the fourth factor, the actor's motive, the issue is whether the degree of malice motivating the Bank and Dickinson is so overwhelming so as to tip the scales in favor of liability. *Riley*, 847 S.W.2d at 89. There is evidence that under the terms of the note and deed of trust, the Killions were in default, and the Bank and Dickinson were motivated to collect the debt owed to the Bank by the Killions by instituting foreclosure proceedings. Their decision was made in light of the Killions' admitted historical inability to pay their mortgage debts. The Killions had been in default in two of the three years of the period of the Bank's loans, and the land note was made to bail out the Killions from their default on two Federal Land Bank mortgages. "In a society which professes to believe in the free enterprise system, profit motivation, economic self-interest, and business success are not offensive terms." *Lundberg*, 661 S.W.2d at 671. Clearly, the Bank and Dickinson were acting in their own economic interest in instituting the foreclosure proceedings.

■ However, there is also evidence that the Bank and Dickinson were motivated by malice. The Bank's and Dickinson's actions prior to the first attempted foreclosure give rise to the reasonable inference that the

Bank and Dickinson proceeded with foreclosure as retribution against the Killions for refusing to sign the modification agreement and for challenging the contingent interest provision. The Bank's and Dickinson's ill-will toward the Killions can also be inferred from the statement made by Mr. Frick, the attorney for Dickinson, on the day of the second attempted foreclosure sale when Mr. Frick told the crowd at the foreclosure sale that the sale was off for that day, but "[t]here will be a sale. This farm will sell." After this court affirmed the trial court's judgment declaring that the contingent interest provision in the Killions' note was invalid and unenforceable, the Bank refused to release its deed of trust until it was ordered to do so by the trial court and, even then, the Bank and Dickinson required Chemical Bank to wire transfer the payoff funds to them.[6] While the degree of malice motivating the Bank and Dickinson is not so overwhelming so as to tip the scales in favor of liability, the evidence supports the finding that in addition to intending to collect the Killions' debt, the Bank and Dickinson intended to injure the Killions by instituting foreclosure proceedings. Thus, this factor weighs equally in favor of the Bank and Dickinson and the Killions.

In summary, the application of the balancing of interests tests to the facts of this case indicates that, while the Bank and Dickinson were motivated in part by malice in instituting the foreclosure proceedings against the Killions, they had an additional legitimate motivation to collect the Killions' debt. The Bank and Dickinson did have the right under the deed of trust and note to institute foreclosure proceedings in the event of the Killions' default, although their conduct contributed to cause the default. Their initiation of

foreclosure proceedings was neither shocking nor immoral, and a lender's use of the expeditious non-judicial foreclosure of deeds of trust is not to be discouraged. And most importantly, the evidence regarding the Killions' injury demonstrates only that the Killions suffered emotional distress in the form of stress, humiliation, and embarrassment that was not severe. There was no evidence regarding the duration of the Killions' emotional distress. The Killions' emotional injury as a result of the Bank's and Dickinson's conduct is the harm least deserving of protection under a prima facie tort cause of action, and its significance depends upon its severity. While this court does not minimalize the effects that the Bank's and Dickinson's actions had on the Killion family, the law requires that a plaintiff demonstrate more serious harm to an interest which is least deserving of protection. Weighing the conflicting interests of the parties to this case in light of the social and economic interests of society, legal redress would be inappropriate and the Killions failed to make a submissible case of prima facie tort.[7]

The Bank and Dickinson argue that this court should abolish the prima facie tort cause of action. Although the doctrine has been criticized by the Missouri Supreme Court in *Brown v. Missouri Pacific R. Co.*, 720 S.W.2d 357, 361 (Mo. banc 1986) ("No case resulting in a verdict for the plaintiff on a prima facie tort theory has been affirmed by the Missouri appellate courts."), and in *Dake v. Tuell*, 687 S.W.2d 191, 192 (Mo. banc 1985) (referring to the "misty shroud of prima facie tort"), the most recent Supreme Court opinion, *Nazeri v. Missouri Valley College*, 860 S.W.2d 303, 315 (Mo. banc 1993), specifically recognizes the prima facie tort

---

**6.** Although these acts occurred after the attempted foreclosures, they constitute circumstantial evidence of the Bank's and Dickinson's earlier intent at the time the foreclosure sales were instituted. *See Breier v. Koncen Meat Co.*, 762 S.W.2d 499, 500 (Mo.App.1988) (finding in an action for misrepresentation of an employment agreement that evidence of the promisor's conduct prior to and subsequent to the execution of the agreement was sufficient circumstantial evidence to create a fact question for the jury on the issue of the promisor's intent at the time the agreement was executed).

**7.** Even if one accepts the dissent's position that the Killions had made a submissible case of prima facie tort, this court believes that a reversal of the judgment and a remand would still be warranted based upon the trial court's abuse of its discretion in allowing the Killions to read Judge Barnes' inflammatory and prejudicial remarks to the jury, as raised in the Bank and Dickinson's Point II.

cause of action. Since this court is bound by the precedent of the most recent Supreme Court decision, we are without the authority to abolish the doctrine of prima facie tort. *Schumann v. Missouri Highway and Transp. Com'n,* 912 S.W.2d 548, 552 (Mo. App.1995).

### The Killions Failed to Make a Submissible Case of Breach of Fiduciary Duty and Breach of the Duty of Good Faith

■ The Killions argued that if this court determines that the trial court erroneously entered a judgment on the prima facie tort theory, the cause should be remanded for a new trial on their counts for breach of fiduciary duty against Mr. Crist and Dickinson and breach of the duty of good faith against the Bank. On their breach of fiduciary duty claim, the Killions contend that Mr. Crist breached his fiduciary duty as trustee under the deed of trust by instituting the foreclosure sales when he knew or should have known that (1) the Killions were challenging the enforceability of the contingent interest provision; (2) the Killions could not pay off the promissory note through refinancing until the contingent interest dispute was decided; and (3) the Killions would lose their property and equity in the property if a foreclosure sale was held.

■ A fiduciary relationship does exist between the trustee of a deed of trust and the debtor and creditor. *Spires v. Edgar,* 513 S.W.2d 372, 378 (Mo. banc 1974). The trustee is considered to be the agent of both the debtor and creditor and should perform the duties of the trust with impartiality and integrity. *Edwards v. Smith,* 322 S.W.2d 770, 777 (Mo.1959). However, when requested by the creditor to foreclose, the trustee may proceed without making any affirmative investigation unless the trustee has actual knowledge "of anything which should *legally* prevent the foreclosure." *Spires,* 513 S.W.2d at 378 (emphasis added). While Mr. Crist may have had knowledge of all of the facts asserted by the Killions to preclude foreclosure, none of them provide a *legal* basis for preventing the institution of the foreclosure proceedings, considering that the Killions were in default and Dickinson and the Bank

had the right to foreclose under the deed of trust. *See Spires,* 513 S.W.2d at 378; *Farris v. Hendrichs,* 413 S.W.2d 185, 188–89 (Mo. 1967); *Edwards,* 322 S.W.2d at 777. The Killions did not make a submissible case on their breach of fiduciary duty claim against Mr. Crist and Dickinson. Therefore, they are not entitled to remand of this claim.

■ Likewise, the Killions failed to make a submissible case on their claim for breach of the duty of good faith against the Bank. In their petition, the Killions allege a tort cause of action for breach of the duty of good faith against the Bank and request compensatory and punitive damages. In support of their request for a remand of this claim, the Killions contend that in *Rigby Corp. v. Boatmen's Bank and Trust Co.,* 713 S.W.2d 517 (Mo.App.1986), this court recognized a tort cause of action by a borrower against a lender for breach of the duty of good faith. The Killions misread *Rigby.* In *Rigby,* the borrower pled a cause of action for breach of fiduciary duty under Chapter 400, RSMo (the Uniform Commercial Code), and requested compensatory and punitive damages. *Id.* at 535–36. This court rejected the borrower's claim on the basis that the Code provides only a contract, and not a tort remedy for breach of the duty of good faith, and therefore does not permit recovery for compensatory and punitive damages. *Id.* However, this court also stated that the Code does allow a party aggrieved by a breach of the duty of good faith to resort to non-Code law to recover under a tort action if non-Code law permits such cause of action. *Id.* at 536–37. The court then examined Missouri's non-Code law and found that Missouri recognizes a tort action for breach of the duty of good faith in cases "where the contract places the contractors in a special relationship or status which the law protects...." *Id.* at 537 n. 13. The Killions do not allege any special relationship between themselves and the Bank. The Killions are not entitled to remand of their claim for breach of the duty of good faith against the Bank.

The judgment of the trial court is reversed.

HANNA, J., concurs.

HOWARD, J., dissents in separate dissenting opinion.

HOWARD, Presiding Judge, dissenting.

Our Supreme Court has recognized, perhaps without great enthusiasm, prima facie tort as a valid cause of action. It exists, yet goes largely unembraced and neglected as the black sheep of the tort family, many times with good reason. However, this particular case fits comfortably within the confines of prima facie tort and should be affirmed as to the judgment for actual damages. As discussed below, I believe the punitive damage award should be reversed.

## Prima Facie Tort

The majority sets forth the four factors the Killions need to establish to make a submissible case: (1) an intentional lawful act; (2) an intent to injure; (3) an injury; and (4) an absence of justification or insufficient justification for the act. *Nazeri v. Missouri Valley College,* 860 S.W.2d 303, 315 (Mo. banc 1993).

In determining whether the Killions have made a submissible case of prima facie tort, the initial consideration is whether the Killions have sufficient evidence of each of the four elements of their claim. The first element required is an intentional lawful act by the Bank and Dickinson. The intentional lawful acts alleged by the Killions are the institution of foreclosure sales of the Killions' property on February 9, 1993 and March 23, 1993. The deed of trust allows the Bank and Dickinson to foreclose on the property in the event of a default by the Killions. One of the events of default listed on both the land note and the equipment note is the failure to pay when due any principal or interest payments. The Bank and Dickinson contend that because the Killions' attorney stated in his closing argument that the Killions were not in default at the time the foreclosure sales were instituted, the Killions essentially "conceded away" the first element of their prima facie tort claim. The Bank and Dickinson argue that the statements in closing argument were judicial admissions that their conduct, in instituting the foreclosure sales when the Kil-

lions were not in default, was unlawful and therefore was not an intentional lawful act under the first element of a prima facie tort claim.

A judicial admission "acts as a substitute for evidence and obviates the need to present evidence on the matter." *Fust v. Francois,* 913 S.W.2d 38, 46 (Mo.App. E.D.1995). To constitute an admission, a statement must be a factual assertion and not a legal conclusion. *Macheca v. Fowler,* 412 S.W.2d 462, 465 (Mo. 1967); *Riley v. Union Pacific R.R.,* 904 S.W.2d 437, 442 (Mo.App. W.D.1995). A statement made by a party's counsel in closing arguments must be clear, unqualified, and unequivocal to be a judicial admission. *Chilton v. Gorden,* 952 S.W.2d 773, 778 (Mo. App. S.D.1997).

The Killions' attorney did argue that the foreclosure sale was based on an "illegal note," and that the Killions were not in default at the time of the attempted foreclosure sales because their payment after the partial sale in February of 1992 not only made up the deficiency in the 1991 payment but also served as a prepayment of the December 1992 payment. The Killions' attorney was not admitting the fact that there was no default but, instead, was arguing a legal conclusion from the facts in evidence. This is not a judicial admission.

In addition, the Killions' attorney also argued that instead of attempting to foreclose on the Killions' property, the Bank and Dickinson could have sued the Killions on the note. Implicit in this latter argument is the Killions' admission that the Killions were in default. This is consistent with the testimony presented by the Killions during their case-in-chief. As counsel for the Bank and Dickinson stated in his closing, "[T]he evidence from all of the plaintiffs that testified was that they knew they were in default." Specifically, Michael and Bill Killion both testified that they were in default at the time the Bank and Dickinson instituted the foreclosure proceedings. There was evidence that the Killions failed to make the December 31, 1992 payments of $42,000 on the land note and $19,706.51 on the equipment note. In light of the evidence and the Killions' counsel's other statements essentially admit-

ting that the Killions were in default, the statement by the Killions' counsel that they were not in default is an argument of a legal conclusion which was equivocal and unclear, and therefore does not constitute a judicial admission that the institution of the foreclosures was unlawful. The Killions presented sufficient evidence that in instituting the foreclosure sales, the Bank and Dickinson were committing intentional lawful acts.

The second element the Killions need to prove is the Bank's and Dickinson's actual intent to injure them. The Killions have a "heavy burden to shoulder" on this element, as they must prove an "actual, specific intent to injure, and not merely an intent to do the act which may result in injury." *Kiphart* v. *Community Fed. Sav. & Loan Ass'n,* 729 S.W.2d 510, 516 (Mo.App. E.D.1987). Thus, the Killions need to establish that the Bank and Dickinson intended to injure them by instituting the two foreclosure sales. The Killions may prove intent by circumstantial evidence. *Butler v. Mitchell–Hugeback, Inc.,* 895 S.W.2d 15, 20 (Mo. banc 1995). Circumstantial evidence is evidence which "does not directly prove a fact in issue but gives rise to a logical inference that the fact exists." *City of Springfield v. Waddell,* 904 S.W.2d 499, 505 (Mo.App. S.D.1995). The fact that the injury might be the natural and probable result of the Bank's and Dickinson's acts is insufficient to establish the malice required for a prima facie tort cause of action. *Boatmen's Bank of Butler v. Berwald,* 752 S.W.2d 829, 833 (Mo.App. W.D.1988). To satisfy the intent requirement for a prima facie tort, actual spite or ill will is necessary. *J.S. DeWeese Co. v. Hughes–Treitler Mfg. Corp.,* 881 S.W.2d 638, 646 (Mo.App. E.D.1994).

There is substantial circumstantial evidence giving rise to the logical inference that the Bank and Dickinson intended to injure the Killions by instituting the foreclosure sales. After the Killions' partial liquidation sale of their property in February of 1992, John Crist, the loan officer at Dickinson, applied $35,129.09 of the proceeds of the sale toward the payment of contingent interest, even though he knew he had no authority under the terms of the note to collect contingent interest at that time and in that amount.

Also at that time, the Bank and Dickinson attempted to get the Killions to sign a modification agreement which consented to the Bank crediting $35,000 to contingent interest, contained an exculpatory clause on usurious or illegal interest in favor of the Bank, and provided that the Killions released the Bank of liability for any claims the Killions might have had against it.

Mr. Crist testified that, after receiving the October 23, 1992 letter from the Killions' attorney, he recommended foreclosure because the Killions would not sign the modification agreement and they were claiming that the contingent interest provision of the note was unenforceable. Mr. Crist sent a letter to the Killions demanding the December 31, 1992 payment a month and a half before it was due and before the Killions were actually in default. In the letter, Mr. Crist specifically referred to the Killions' failure to sign the modification agreement before he made the demand for payment and threatened foreclosure. The Bank and Dickinson refused the Killions' offer to pay all of the unpaid principal and annual interest on both notes plus $15,000 to settle the contingent interest issue. The majority points out that "the Bank's and Dickinson's actions prior to the first attempted foreclosure give rise to the reasonable inference that the Bank and Dickinson proceeded with foreclosure as retribution against the Killions for refusing to sign the modification agreement and for challenging the contingent interest provision." (Op. at 811–812.)

Ill will toward the Killions can also be inferred from the statement made by Mr. Frick, the attorney for Dickinson, during the second foreclosure attempt. After being served with a temporary restraining order halting the second sale, Mr. Frick told the crowd at the foreclosure sale that the sale was off for that day, but "[t]here will be a sale. This farm will sell." This statement evidences the Bank's and Dickinson's intent to injure the Killions, not their intent to simply collect a debt.

After the second attempted foreclosure sale was enjoined, the Bank and Dickinson continued to take actions which indicate their intent to injure the Killions. "Although

these acts occurred after the attempted foreclosures, they constitute circumstantial evidence of the Bank's and Dickinson's earlier intent at the time the foreclosure sales were instituted." (Footnote 6, op. at 812.) After this court affirmed the trial court's judgment declaring that the contingent interest provision in the Killions' note was invalid and unenforceable, the Killions informed Chemical Bank of the appellate decision. Chemical Bank was willing to refinance the loan if the Bank would release its deed of trust. The Bank refused to release its deed of trust to allow the refinancing, as the attorney for Dickinson claimed that the Killions owed $29,000 in attorney fees. The trial court held a hearing on the matter.

Even after the trial court recommended that the Bank release its deed of trust conditioned upon a receiver, previously appointed at the Bank's request, retaining $40,000 the receiver had collected in farm income pending the resolution of the attorney fee dispute, the Bank and Dickinson refused to release the deed of trust. The trial court finally entered an order effectuating its recommendation. The Bank and Dickinson then refused to accept a check from a Chemical Bank representative to pay off the Killions' note, claiming that Chemical Bank's check was not "good and available funds." The Bank and Dickinson required Chemical Bank to wire transfer the payoff funds to them.

The Bank's and Dickinson's conduct before, during and after the attempted foreclosure sales provides substantial evidence of their intent to injure the Killions by instituting the foreclosure sales. The Bank's and Dickinson's actions indicate more than just an intent to foreclose and collect the debt owed by the Killions; they indicate actual malice and spite toward the Killions. The Killions presented sufficient evidence on the second element of their prima facie tort cause of action.

The next element the Killions need to prove is that they were injured by the Bank and Dickinson threatening to proceed with the foreclosure sales. An injury is defined as "the invasion of a legally protected interest." *Porter v. Crawford & Co.*, 611 S.W.2d 265, 271 (Mo.App. W.D.1980). The Bank and

Dickinson argue that because they had the right to begin foreclosure proceedings when the Killions defaulted on their mortgage, and Missouri law requires that they publish notice of the foreclosure, the Killions suffered no injury because the Bank's and Dickinson's actions were lawful. If this were the case, no prima facie tort plaintiff could ever succeed, as the cause of action requires the plaintiff to establish that the defendant committed a lawful act.

As the majority points out, the "evidence proves that the Killions were stressed, humiliated and embarrassed." (Op. at 809.) That evidence will not be repeated here. Permitting the recovery of damages for emotional distress in a prima facie tort cause of action is consistent with the general rule in Missouri that one can recover for emotional injuries without an accompanying physical injury when there is "malice, willfulness, wantonness or inhumanity." *Medlock v. Farmers State Bank of Texas County*, 696 S.W.2d 873, 879 (Mo.App. S.D.1985). Since a cause of action for prima facie tort includes the element of malice, under general Missouri law, emotional injury alone would be sufficient to prove the element of injury. Here, the Killions presented evidence of emotional injury in that they testified they were stressed, humiliated and embarrassed by the actions of the Bank and Dickinson.

The fourth element the Killions need to prove by substantial evidence is the absence of justification or insufficient justification for the Bank's and Dickinson's threatening to proceed with the foreclosure sales. The Bank and Dickinson argue that because the Killions were in default, they were lawfully permitted to initiate foreclosure proceedings and had a valid business reason for doing so, despite any dispute over the contingent interest provision. They contend, therefore, that they were justified in following established legal procedure by initiating foreclosure proceedings.

In support of their claim that they had a valid business reason for foreclosing, the Bank and Dickinson cite *Centerre Bank of Kansas City, N.A. v. Distributors, Inc.*, 705 S.W.2d 42 (Mo.App. W.D.1985). *Centerre* is distinguishable from the present case. In

*Centerre,* this court reversed a jury verdict in favor of the plaintiff on the basis that Centerre had a valid business reason for calling a promissory note due, and such justification alone was sufficient to defeat the plaintiff's prima facie tort cause of action. *Id.* at 54. The bank in *Centerre* had reason to believe that it was insecure because of inadequate collateral. *Id.* There was evidence that the plaintiff had been losing money for a period of time, the inventory figures given to the bank were suspect, and the bank believed the company was in a negative position. *Id.* In this case, the Bank and Dickinson were well-secured. The proceeds from the liquidation sale reduced the principal balance on the land note to approximately $171,500 and the principal balance on the equipment note to $25,000, and this does not include credit for the $35,129.09 that the Bank and Dickinson incorrectly applied toward the payment of contingent interest. The remaining real property and equipment securing the notes was valued at $356,000.

Additionally, the evidence showed that the Killions' default on the note was caused by the Killions' inability to refinance their debt to the Bank because the Bank would not release the deed of trust on the Killions' farm unless they paid contingent interest under an illegal provision in the note. The majority properly discounted the defendants' argument that they believed the contingent interest provision was enforceable. "There was evidence that the Bank and Dickinson were aware of the potential invalidity of the contingent interest provision and its questionable enforceability because Mr. Crist, the Bank's agent and Dickinson's employee, tried to get the Killions to sign the proposed note modification agreement. The proposed modification agreement contained an exculpatory clause on usurious or illegal interest in favor of the Bank, and provided that the Killions released the Bank of liability for any claims they might have had against it. The reasonable inference is that the Bank and Dickinson had knowledge of the invalidity of the contingent interest provision." (Op. at 810–811.)

Despite this knowledge, they initiated foreclosure proceedings when the Killions questioned the provision and refused to sign the modification agreement waiving their rights against the Bank and Dickinson, and caused the Killions' default by refusing to release the deed of trust unless the Killions paid illegal contingent interest. As indicated by the majority, the Bank and Dickinson could well have suspended foreclosure proceedings pending the adjudication of the validity of a questionable interest provision, knowing that they had security worth far more than the principal amount of the loans and any interest which would accrue during the pendency of any action. As the majority notes, the method of computing contingent interest was also invalid because it was unconscionable. The Killions presented substantial evidence that the Bank and Dickinson lacked sufficient justification to maintain foreclosure proceedings, the fourth element of their claim for prima facie tort.

Since the Killions presented evidence on each of the elements of their claim for prima facie tort against the Bank and Dickinson, the court must undertake the "balancing of interests" test to determine whether their conduct was tortious. The four factors weighed by the court under this test are: "(1) the nature and seriousness of the harm to the injured party; (2) the interests promoted by the actor's conduct; (3) the character of the means used by the actor; and (4) the actor's motive." *Lundberg v. Prudential Ins. Co. of America,* 661 S.W.2d 667, 671 (Mo.App. W.D.1983).

I agree with the majority that factor one is weighed in favor of the Bank and Dickinson. The Killions suffered real harm as previously pointed out here and in the majority opinion. However, physical harm to person or property receives more weight than emotional harm. *Id.*

The majority demonstrates very well that the second factor is weighed in favor of the Killions. I won't attempt to improve on that analysis.

Factor three requires the consideration of whether there is conduct which "offends societal concepts of fairness and morality." Id. The majority weighs this factor in favor of the Bank and Dickinson because initiating foreclosure proceedings and publishing the foreclosure notices "were not shocking or

immoral in light of the fact that the note and deed of trust gave them the right to foreclose in the event of default." (Op. at 811.)

Merely because the documents conferred a right to foreclose does not mean the exercise of that right cannot be shocking or immoral. Possessing a legal right to act is not an absolute defense. In fact, it is an element of the tort that the act complained of be lawful.

The focus regarding factor three is whether the conduct here offends societal concepts of fairness and morality. I believe it does.

The attenuating circumstances surrounding the defendants' act prevent their "right" to foreclose from being used as a shield from liability. The foreclosure procedures were carried out under circumstances that were unfair and offensive. The conduct described here and in the majority opinion offends societal concepts of fairness and morality and weighs in favor of defendants' liability.

The majority also points to the case of *Reese v. First Missouri Bank & Trust Company*, 736 S.W.2d 371 (Mo. banc 1987), which declined to authorize a cause of action for wrongful attempted foreclosure. Whether or not wrongful attempted foreclosure is, in and of itself, a cause of action does not dispose of our inquiry.

Prima facie tort has been recognized as a cause of action by our Supreme Court and requires a much different analysis than the *Reese* court was confronted with. The intentional act of a defendant, whether an attempted foreclosure or some other act, is but one element of a prima facie tort. In fact, it is a requirement that the act complained of not be, in and of itself, a cause of action. Otherwise that cause, not prima facie tort, must be pursued.

In the landmark case first recognizing this tort in Missouri, the defendants argued that there could be no cause of action because of their statutory right to stop payment on a check given to plaintiff. *Porter v. Crawford*

& *Co.*, 611 S.W.2d 265, 273 (Mo.App. W.D. 1980). The court responded in this way:

> Thus, the defendants continue to refuse to recognize the principle that the duty violated in any intentional tort is the duty to avoid intentionally causing harm to another without justification.

*Id.* In the context of prima facie tort, it is not the act of the defendant which creates the tort. It is that the act was done with an intent to injure without sufficient justification. *Porter*, 611 S.W.2d at 268.

Prima facie tort is not a recent innovation, having evolved and developed for almost a century. *Schmitz v. Smentowski*, 109 N.M. 386, 785 P.2d 726, 734 (N.M.1990). The significant safeguards and balancing considerations unique to this tort make the majority's concerns about a chilling effect unwarranted.

The majority opinion weighs the fourth factor equally in favor of the Bank and Dickinson and the Killions. It acknowledges evidence of ill will toward the Killions and that the evidence supports the finding that the defendants intended to injure the Killions by instituting the foreclosure sales. However, the majority tips the scales back to even, citing *Lundberg* for the proposition that the defendants are entitled to advance "a valid business purpose" and because "in a society which professes to believe in the free enterprise system, profit motivation, economic self-interest, and business success are not offensive terms." (Op. at 811, quoting *Lundberg*, 661 S.W.2d at 671.)

I agree that those terms are not patently offensive and believe the defendants were indeed motivated by profit, economic self-interest and success. At what price? The defendants' actions perverted those time-honored business terms and the conduct in this case bears little resemblance to "free" enterprise.[1] I believe that this factor weighs in favor of the Killions.

The majority concedes evidence of the first two factors of a submissible case: an intentional lawful act and an intent to injure. I

---

1. Two additional points of error were raised by the Bank and Dickinson. They allege that the jury should not have had the contents of Judge Barnes' court order read to them and that during closing argument plaintiff impermissibly argued

an adverse inference from the Bank's failure to call its president, Paul Sheperd, to testify. I do not believe either point constitutes reversible error.

also believe the Killions established the remaining two factors: that they were injured, and that the injury was without justification. The defendants' actions were wrongful and their liability was established.

### Jury Instruction on Punitive Damages

The Bank and Dickinson also claim that the trial court erred by refusing to instruct the jury that it needed clear and convincing evidence that the companies acted with evil motive or reckless indifference to the rights of others before imposing punitive damages. They claim that the recent pronouncement of the Missouri Supreme Court in *Rodriguez v. Suzuki Motor Corp.*, 936 S.W.2d 104 (Mo. banc 1996) compels this court to remand this case to the trial court in order to instruct the jury on the clear and convincing standard of proof with regard to punitive damages. I agree.

At trial, the attorney for the Bank and Dickinson objected to the jury instruction on the ground that it did not instruct the jury on the clear and convincing evidence standard. The trial court overruled their objection and merely instructed the jury that the standard was, in effect, the preponderance of the evidence. The Bank and Dickinson also raised this issue in their motion for new trial, thus properly preserving the issue for our review. *See Balke v. Central Missouri Elec. Coop.*, 966 S.W.2d 15, 21 (Mo.App. W.D. 1997).

In *Rodriguez*, the Missouri Supreme Court determined the appropriate standard of proof for cases in which the jury must determine whether to impose punitive damages against a defendant. The court determined that "[b]ecause punitive damages are extraordinary and harsh, ... a higher standard of proof is required: For common law punitive damage claims, the evidence must meet the clear and convincing standard of proof." *Rodriguez*, 936 S.W.2d at 111. The Rodriguez court determined that this change in the common law should apply prospectively only. *Id.* Specifically, the court determined that the clear and convincing standard of proof for punitive damages shall apply to all cases in which trial begins after February 1, 1997, and all other pending cases in which a proper objection to the punitive damages instruction has been preserved. *Id.*

*Rodriguez* was decided December 17, 1996, and rehearing denied on January 21, 1997. This case was pending as of the date *Rodriguez* was decided since the direct appeal was not exhausted. *State v. Cobb*, 875 S.W.2d 533, 534 (Mo. banc 1994). Therefore, under *Rodriguez*, the trial court should have instructed the jury that the burden of proof for punitive damages in this case was "clear and convincing evidence." *Cole v. Goodyear Tire & Rubber Co.*, 967 S.W.2d 176, 186 (Mo.App. E.D.1998). I would therefore reverse the judgment for punitive damages and remand the matter for a new trial on that issue.