

# Missouri Court of Appeals

## Southern District

### Division One

CHRISTINA DINKINS, )
)
    Respondent-Cross Appellant, )
)
    vs. ) Nos. SD32671 and SD32698
) (Consolidated)
SOUTH IRON R-1 SCHOOL DISTRICT, ) Filed: July 31, 2014
)
    Appellant-Cross Respondent. )

APPEAL FROM THE CIRCUIT COURT OF IRON COUNTY

Honorable Sidney T. Pearson, III, Circuit Judge

## AFFIRMED

In this case, both parties have appealed and cross appealed. South Iron R-1 School District ("the District") appeals the judgment of the trial court reversing the decision of the South Iron R-1 School District Board of Education ("the Board") that terminated Christina Dinkins' ("Dinkins") employment with the District for insubordination. We affirm the judgment of the trial court.[1]

---

[1] In matters involving termination of a tenured teacher, we review the findings of fact and decision of the Board and not the judgment of the trial court. ***Gerig v. Bd. of Educ. of Cent. Sch. Dist., R-III***, 841 S.W.2d 731, 733 (Mo.App. E.D. 1992). As a result, this Court, by its own motion, ordered Dinkins to first file the appellant's brief and reply brief, if any, and directed the District to prepare a respondent's brief. *See* Rule 84.05(e). Thereafter, Dinkins filed a Notice of Appeal although Rule 84.05(e) did not specifically require her to do so. The appeals were then consolidated.

All Rule references are to Missouri Court Rules (2013).

## Facts and Procedural History

The District is a Missouri public school district and a political subdivision of the state of Missouri. Dinkins had been teaching at South Iron R-1 Elementary School for thirteen years, primarily at the fifth grade level. Dinkins' employment was as a "permanent teacher" with an "indefinite contract" as defined by section 168.104(3)[2] of the Teacher Tenure Act. *See* §§ 168.102–168.130.

On October 2, 2007, Cristie Ayers ("Ayers"), the principal for the South Iron R-1 Elementary School, provided Dinkins a letter as directed by section 168.116.2. The letter stated that Dinkins was "insubordinate in the line of duty" and cited two specific examples of conduct:

a. You were provided with your 2007/2008 class roster three (3) weeks prior to the start of school by your supervisor, and notified to bring any concerns or comments to her attention prior to the start of school. You confronted your supervisor regarding your class roster fifteen (15) minutes prior to the commencement o [sic] school on August 16, 2007. You accused your supervisor of being hypocritical and you generally used a disrespectful and unprofessional tone and language when addressing your supervisor.

b. After Ms. Bell informed you that your supervisor notified her it was inappropriate to bring a concern regarding bus drivers to the superintendent prior to addressing your concern with your supervisor (the proper chain of command) you confronted your supervisor in front of parents, staff and students in a disrespectful and unprofessional manner. You stated that you would be including in your letter to the superintendent that you had notified your supervisor of the problem three (3) times, implying that your supervisor had not addressed the issue in a timely manner. When questioned about the three notifications, you admitted that those notifications took place during the same school day.

---

[2] All references to statutes are to RSMo 2000, unless otherwise indicated.

The letter further directed Dinkins to "follow all instructions and orders, both verbal and written, of your supervisors, including, but not limited to principals[]"; "to refrain from words and conduct that indicates a defiance of proper authority"; and "to follow the proper chain of command with any concerns."

The letter provided that Dinkins would be placed on a "Professional Improvement Plan" ("2007 PIP"), which would be "monitored and continued through the 2007/2008 school year, with no consideration to move out of this PIP status until the end of the 2007/2008 school year."[3] The letter continued: "Any future conduct during your tenure in the South Iron School District of a similar nature could result in a recommendation to the Board of Education for termination of your employment."

In pertinent part, the 2007 PIP provided:

3.     Improvement Objective(s):   (Applicable descriptors and/or definable deficiencies)
**Complies with school board policy on staff conduct, File GBCB.**

4.     Procedures for Achieving Objectives(s):  (Explanation of teacher and administrator responsibilities)
**When questioning your supervisor, do it in a timely manner and direct all questions in the appropriate environment.**

5.     Appraisal Method and Target Dates:
**The end** [sic] **first semester and end of second semester**[.]

(Bold in original).

Almost five years later, on January 17, 2011, Ayers presented Dinkins with a second Professional Improvement Plan ("2011 PIP"). According to Ayers, she decided to issue the 2011 PIP based upon receiving "numerous amounts of parent complaints" towards Dinkins in

---

[3] Ayers presented Dinkins with the 2007 PIP a few days later on October 11, 2007.

December 2010.[4]  Thereafter, it was alleged that Dinkins violated the 2011 PIP on three occasions and, on February 23, 2011, a "Notice of Charges" ("2011 Notice") was served upon Dinkins by superintendent Don Wakefield ("Wakefield").

As grounds for termination, the 2011 Notice stated that Dinkins was "insubordinate in the line of duty" and listed as "charges" the October 2, 2007 letter, described as a "Letter of Deficiency," and incorporating *in toto* the two alleged insubordinate acts outlined in that letter; and Dinkins' three alleged violations of the 2011 PIP, which were described in section "B." as:

1.  You sent grade sheets out on January 26, 2011.  Shortly after, you received a parent response requesting grade for his child.  You failed to respond to the parent until the next grade sheets were sent home on February 16, 2011.

2.  On January 28, 2011, a parent stated that you humiliated her child in front of the class by telling that student it was her responsibility to keep up with the homework papers and to put them in the right place in the student's folder and not the student's mother.  The mother of the child explained that she took the papers out of her child's folder and used them to start a fire.  She stated that her child did not have any control over the matter.  The parent felt that you could have handled the situation in a more appropriate manner instead of singling her child out in front of the class.  The parent confronted you with this concern, however, you failed to communicate this issue to your supervisor as you were directed to the Professional Improvement Plan.

3.  On February 14, 2011, you told another employee that a student gave you a note that another student had written that was addressed to your supervisor.  Rather than giving the letter to your supervisor, as required by your Professional Improvement Plan, you talked to the student directly.  The student's parent was aware of the note written by her child and was upset that the principal did not receive the note.  When confronted about this on February 21, 2011, you stated that you did not know what you did with the note.

_____

[4] The "Improvement Objectives" provided in the 2011 PIP were:  "**Provide frequent information to parents about the instructional program and about positive and negative aspect of student's progress in an appropriate and respectful manner[;] [r]espond to parent concerns with great sensitivity[;] [and] [c]ommunicate effectively with supervisors.**"  The stated "Procedures for Achieving Objective(s)" were:  "**Demonstrate cohesive relationships with colleagues and parents[;] [r]educe number of parent complaints to no more than three during the next three months**."  (Bold in original).  At the time of issuance of the 2011 PIP, Ayers verbally directed Dinkins to report all parent complaints to Ayers.

4

The 2011 Notice made no mention of the 2007 PIP, nor did it allege that Dinkins had been insubordinate on any occasion other than the specific examples listed in the October 2, 2007 letter and the specific violations of the 2011 PIP.

On March 29, 2011, a hearing was held before the Board. Dinkins moved to dismiss the 2011 Notice, arguing in part that the District's procedure had violated section 168.116.2. That motion was later denied. On March 31, 2011, the Board issued its "Findings of Fact" and "Conclusions of Law" terminating Dinkins' teaching contract following a five-to-one vote. The Board found that the charges contained in the 2011 Notice were proven and concluded that Dinkins acted "insubordinately in the line of duty" in that Dinkins: (1) "was defiant to authority"; (2) "failed to appropriately comply with administrative directives to communicate all parent complaints and concerns to her supervisor (Ayers)"; and (3) failed "to provide frequent information to parents regarding the instructional program and student progress."

Dinkins appealed the Board's decision to the Circuit Court of Iron County, which reversed the Board's decision. The trial court ordered, among other things, that the District immediately restore Dinkins to permanent teacher status and award Dinkins payment of all compensation due for the period during which Dinkins was terminated from employment. This appeal followed.

Because we find her second point dispositive, the basic issues for our determination are:

1. Did the District comply with the procedure set forth in section 168.116.2 for terminating Dinkins' permanent contract on the basis of insubordination?

2. Did the trial court err in failing to grant Dinkins reasonable attorney fees under section 168.120.4?

5

### *The District Violated the Procedure of Section 168.116.2*

### **Standard of Review**

Section 168.120 provides that appeals from the decision of the Board shall be governed by chapter 536. Evidence and all reasonable inferences are construed in the light most favorable to the decision of the Board, and we may not substitute our judgment of the evidence. ***Johnson v. Francis Howell R-3 Bd. of Educ.***, 868 S.W.2d 191, 195 (Mo.App. E.D. 1994). Where the action being reviewed "does not involve the exercise by the [Board] of administrative discretion in the light of the facts, but involves only the application by the [Board] of the law to the facts," our review is *de novo*. § 536.140.3, RSMo Cum.Supp. 2005.[5] "Accordingly we view the question of whether the Board complied with the procedural and substantive provisions of the [Teacher Tenure] Act in the termination proceeding as a question of law, and review under Rule 73.01 as interpreted in ***Murphy v. Carron***, 536 S.W.2d 30, 32 (Mo. banc 1976)." ***Iven v. Hazelwood School Dist.***, 710 S.W.2d 462, 464 (Mo.App. E.D. 1986).

### **Analysis**

Section 168.116 sets forth a required process to be followed in order to terminate the indefinite contract of a permanent teacher on the grounds of incompetency, inefficiency, or insubordination. ***O'Connell v. School Dist. of Springfield R-12***, 830 S.W.2d 410, 412 (Mo. banc 1992); ***Selby v. North Callaway Bd. of Educ.***, 777 S.W.2d 275, 276 (Mo.App. W.D. 1989); ***Iven***, 710 S.W.2d at 464. Prior to formal charges, the Board must issue a "warning letter" and allow for a minimum thirty-day "curative period." ***Selby***, 777 S.W.2d at 276. "The purpose of [s]ection 168.116.2 is to give the teacher an opportunity to know exactly what the complaints against him [or her] are and to afford him [or her] an opportunity to cure the situation before

---

[5] This section will hereinafter refer to RSMo Cum.Supp. 2005.

charges are brought." ***Adkins v. Hazelwood School Dist.***, 743 S.W.2d 869, 872 (Mo.App. E.D. 1987). Section 168.116.2 specifically describes this procedure:

> At least thirty days before service of notice of charges of incompetency, inefficiency, or insubordination in line of duty, the teacher shall be given by the school board or the superintendent of schools warning in writing, stating specifically the causes which, if not removed, may result in charges. Thereafter, both the superintendent, or his designated representative, and the teacher shall meet and confer in an effort to resolve the matter.

A "good faith effort to give the teacher a chance to remedy defects" is required. ***Iven***, 710 S.W.2d at 465. Thereafter, if necessary, the teacher may be served with a "termination letter," which "'must relate to the scope of the warning and subsequent meeting. Otherwise the intent of the legislature to provide substantive and procedural safeguards would not be honored.'" ***Selby***, 777 S.W.2d at 276 (quoting ***Smith v. Normandy School Dist.***, 734 S.W.2d 943, 947 (Mo.App. E.D. 1987). "We have described this procedure as 'strictly defined' and not subject to evasion." ***Hellmann v. Union School Dist.***, 170 S.W.3d 52, 59 (Mo.App. E.D. 2005) (quoting ***Iven***, 710 S.W.3d at 464).

Dinkins contends that she was terminated "for reasons unrelated to" the October 2, 2007 letter. In its decision, the Board found that pursuant to section 168.116.2, the October 2, 2007 letter served as Dinkins' "warning letter." This letter asserted that Dinkins had engaged in insubordinate conduct, which is a statutory cause for termination. § 168.114.1(3). The letter cited two specific examples of alleged insubordinate conduct and indicated that Dinkins would "be placed immediately on a PIP evaluation plan with no consideration to move out of this PIP status until the end of the 2007/2008 school year." The record reveals that a few days later, Dinkins was presented with the 2007 PIP indicating that its target dates would be "**[t]he end** [sic] **first semester and the end of second semester**[**.**]"

7

Although the period provided for in the October 2, 2007 letter and 2007 PIP is longer than the thirty days mandated by section 168.116.2, an enlargement of time is not prohibited. *O'Connell*, 830 S.W.2d at 416. "A reasonable enlargement of time to correct deficiencies works for the benefit of the teacher." *Id.* The District acted within its discretion in enlarging Dinkins' probationary period until the end of the 2007/2008 school year.

The failure of the District's subsequent procedure, however, is that there was no demonstration that by the end of the 2007/2008 school year Dinkins had not "move[d] out of" PIP status; not achieved compliance with the 2007 PIP's target dates; or that because meet and cure efforts during the 2007/2008 school year were unsuccessful, Dinkins' probationary period was further extended to allow her more time to cure her alleged deficiencies.[6] Furthermore, by way of the 2011 Notice, Dinkins was not charged with insubordination as a result of conduct occurring during the 2007 PIP; rather, three incidents far removed from 2007—alleged violations of the 2011 PIP—spurred the District's formal charges against Dinkins. The 2011 PIP did not explicitly reference the 2007 PIP, nor could it reasonably be construed as being an extension to the 2007 PIP since the purpose behind its implementation was to address parent complaints that arose late in 2010.

Moreover, even if we were to assume that the October 2, 2007 letter and 2007 PIP applied to conduct occurring into 2011, we note from the record before us that the charges in the 2011 Notice do not constitute the same *type* of conduct to which the October 2, 2007 letter and 2007 PIP were directed. *See Smith*, 734 S.W.2d at 947-48; *Blue Springs Reorganized School*

_____

[6] The transcript from Dinkins' termination hearing does reflect that Ayers testified there were instances pre-dating the 2011 PIP where Dinkins had not complied with the October 2, 2007 letter and the 2007 PIP. However, Dinkins was not charged with insubordination on this basis in the 2011 Notice, nor did the Board conclude that Dinkins had been insubordinate on this basis in its findings of fact and conclusions of law. *See Selby*, 777 S.W.2d at 279-80. In any event, Ayers did not specify in her testimony *how* Dinkins failed to comply with either the October 2, 2007 letter or the 2007 PIP thereby depriving the allegation of any legal effect. *See* § 168.116.1 (stating that charges against a teacher must be based upon grounds *specified with particularity*).

***Dist. IV v. Landuyt***, 499 S.W.2d 33, 37-38 (Mo.App. K.C.D. 1973). The October 2, 2007 letter was directed to two specific instances where Dinkins confronted Ayers in a manner deemed "disrespectful and unprofessional"; the 2007 PIP outlined the procedure by which Dinkins could improve: "**When questioning your supervisor, do it in a timely manner and direct all questions in the appropriate environment**." (Bold in original). The three violations of the 2011 PIP, in contrast, concerned: (1) a failure to timely respond to a request from a parent; (2) a failure to communicate a parent complaint to her supervisor (Ayers); and (3) a failure to forward a student note to her supervisor (Ayers). None of these situations involve instances where Dinkins failed to question her supervisor "in a timely manner" or failed to direct her questions "in the appropriate environment."

In its responsive brief to Dinkins' point, the District presents a threadbare response. The response, without any argument, merely quotes passages from the October 2, 2007 letter. It states, *in toto*:

> The Letter of Deficiency clearly states, 'The purpose of this letter is to inform you that I consider you to be insubordinate in the line of duty. . . [sic] You are directed to follow all instructions and orders, but verbal and written, of your supervisors, including, but not limited to principals. You are directed to refrain from words and conduct that indicate[] a defiance of proper authority and to follow the proper chain of command with any concerns. . . [sic] Any future conduct during your tenure in the South Iron School District of a similar nature could result in a recommendation to the Board of Education for termination of your employment.'

We assume the District, in citing this portion of the letter, means to argue that: (1) the scope of these general directives covered Dinkins' violations of the 2011 PIP; and (2) Dinkins was put on notice, for an indefinite period of time, that she could be terminated for violating those general directives. If so, these arguments must fail. When issues in the warning letter are ignored as they were here in a subsequent meeting, the scope of the warning letter is accordingly

9

limited. Charges "*must* relate to the scope of the warning *and* subsequent meeting." **Smith**, 734 S.W.2d. at 947 (emphasis added). The record demonstrates that the 2007 PIP contained the terms regarding how Dinkins was expected to improve her deficiencies in the October 2, 2007 letter. The 2007 PIP, when read together with the October 2, 2007 letter, required that when questioning her supervisor, Dinkins do so "in a timely manner" and "in the appropriate environment"; and announced Dinkins' target dates to be "**[t]he end** [sic] **first semester and end of second semester**[**.**]" (Bold in original)

Accordingly, because the charges in the 2011 Notice did not relate to the scope of the October 2, 2007 letter and 2007 PIP, the District failed to comply with the mandatory procedures of section 168.116.2. Dinkins' second point is granted.

Finding Dinkins' second point to be dispositive, we need not address any of her remaining points attributing error to the Board, or any of the District's points attributing error to the trial court.[7] However, because Dinkins' sixth point concerns whether the trial court afforded her appropriate relief permitted by section 168.120.4, we address it.

### *The Trial Court Did Not Err by Failing to Award Attorney Fees and Costs*

### Standard of Review

"[S]tatutory interpretation is a question of law, and our review of the trial court's interpretation of the relevant statutes is therefore *de novo*." **Estate of Burford ex rel. Bruse v. Edward D. Jones & Co., L.P.**, 83 S.W.3d 589, 594 (Mo.App. W.D. 2002). "'The primary rule of statutory construction is to ascertain the intent of the legislature from the language used, to

---

[7] "'Issues that are not essential to a disposition of the case should not be addressed.'" **S & P Props., Inc. v. Daly**, 330 S.W.3d 128, 130 (Mo.App. E.D. 2010) (quoting **O'Hare v. Permenter**, 113 S.W.3d 287, 289 (Mo.App. E.D. 2003)).

give effect to that intent if possible, and to consider the words used in their plain and ordinary meaning.'" *Id.* (quoting *Hampton v. Hampton*, 17 S.W.3d 599, 602 (Mo.App. W.D. 2000)).

## Analysis

In her sixth point, Dinkins contends that the trial court erroneously applied the law in failing to award her reasonable attorney fees pursuant to section 168.120.4. We disagree.

Missouri follows the "American Rule" which provides that litigants should bear the cost of their own attorney fees. *Moore v. Weeks*, 85 S.W.3d 709, 723 (Mo.App. W.D. 2002). Therefore, we generally do not permit a litigant to recover attorney fees "unless provided by statute or contract, or 'when needed to balance benefits in a court of equity.'" *Id.* (quoting *Killion v. Bank Midwest, N.A.*, 987 S.W.2d 801, 809 (Mo.App. W.D. 1998)).

The statute upon which Dinkins relies states in pertinent part: "If the circuit court finds for the teacher, he *shall* be restored to permanent teacher status and shall receive compensation for the period during which he may have been suspended from work, and such other relief as *may* be granted by the court." § 168.120.4 (emphasis added). Contrary to Dinkins' arguments otherwise, section 168.120.4 does not recognize that a tenured teacher wrongfully terminated has a right to reasonable attorney fees.

The trial court followed the mandatory terms of the statute in ordering that Dinkins be restored to permanent teacher status with payment of back compensation. Based upon the record before us, the trial court was not persuaded to award attorney fees as "such other relief as *may* be granted by the court." § 168.120.4 (emphasis added). Dinkins' sixth point is denied.

11

The judgment of the trial court is affirmed.


WILLIAM W. FRANCIS, JR., C.J. - OPINION AUTHOR

NANCY STEFFEN RAHMEYER, P.J. - Concurs

DANIEL E. SCOTT, J. - Concurs